**J. B. WATKINS, Plaintiff-Appellant,**

v.

**PETRO–SEARCH, INC., et al.,
Defendants-Appellees.**

No. 82–1142
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 18, 1982.

D. Pat Long, Amarillo, Tex., for plaintiff-appellant.

Underwood, Wilson, Sutton, Berry, Steim & Johnson, John Mozola, Amarillo, Tex., for defendants-appellees.

Before GEE, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

This is a Texas diversity case. This litigation involves the interpretation of a letter agreement, including a determination as to whether it is ambiguous so as to permit extrinsic evidence in aid of its interpretation. By the letter agreement, the defendant ("Petro-Search")'s predecessor in title had agreed to "maintain" a salt-water disposal well owned by the plaintiff Watkins. This litigation resulted when the salt-water well failed and became unrepairable. The district court rejected the plaintiff Watkins' contention that, under the terms of the agreement, the defendant Petro-Search was required to repair or replace the failed well.[1] Watkins appeals, urging that the district court erred in so construing the agreement, and also contending that extrinsic evidence supports its interpretation of the contract.[2]

We affirm, finding that, in the light of the surrounding circumstances, the agreement unambiguously did not require replacement of a failed well, further noting that (even if admissible) the extrinsic evidence does not prove such an agreement.

*Legal Principles Applicable*

The decision of this appeal involves the application of Texas law to the interpretation of a contract and, where permissible, to the admission of parol evidence in aid of its construction. The applicable principles may be summarized as follows:

Where an unambiguous writing has been executed between the parties, the courts will enforce the intention of the parties as expressed or apparent in the writing;

in such instance, the instrument alone will be deemed to express the intention of the parties, for it is objective, not subjective, intent that controls. *Sun Oil Company v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1981). However, when a question relating to the construction of a contract or its ambiguity is presented, the court is to take the wording of the contract in the light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording "by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended to mean." *Id.* "If, in the light of the surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing." *Id.*

A contract is ambiguous when it is reasonably susceptible to more than one meaning, in the light of the surrounding circumstances and after applying established rules of construction. *Richland Plantation Company v. Justiss-Mears Oil Co.,* 671 F.2d 154, 156 (5th Cir. 1982) (citing Texas decisions); *see also Pennzoil Company v. Federal Energy Regulatory Com'n,* 645 F.2d 360, 388 (5th Cir. 1981) *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). The determination of whether or not a contract is ambiguous in the light of its wording and the surrounding circumstances is a question of law (although, once the contract is found to be ambiguous, the determination of the parties' intent through the extrinsic evidence is a question of fact). *Id.*

*The Letter Agreement*

The letter agreement was executed on April 14, 1970, between the plaintiff Wat-

---

1. The court did hold that Petro-Search was liable for the $4,000 costs of plugging the failed well, as required by the regulations of a state agency. Petro-Search does not appeal this holding.

2. By his complaint, Watkins had also contended that the failure of the well was due to

Petro-Search's negligence in maintenance or repair efforts. After trial, the district court expressly found against Watkins's claims in these regards. Watkins does not complain on this appeal that these findings were clearly erroneous.

kins and the defendant Petro-Search's predecessor in title and obligation (Katex Oil Company). Katex had need of a disposal well to dispose of salt water from producing wells on two nearby leases, and the letter agreement by its terms permitted Katex to use Watkins' disposal well (also used by him for salt water from his own nearby producing wells), in return for maintaining it without cost to Watkins.

The complete terms of the agreement, as set forth in the 1970 letter to Watkins by Katex and accepted by him, were:

> Katex Oil Company is disposing of excess water produced from their Howard and Marvin Leases in your Douglas # 1 Well. In consideration of the use of your well Katex Oil Company will maintain your well to meet the specifications of the Texas Railroad Commission.

Both parties alternatively contend both that the agreement unambiguously sets forth the intention contended by them and also that the parol evidence supports their respective constructions. The precise issue involved is whether, when the well became unworkable due to natural deterioration or other non-fault of Katex (or its successor, Petro-Search), the latter was required to restore the well to workability before terminating the agreement and restoring the well to Watkins.

The opposing constructions of the agreement may be summarized as follows:

Watkins, the owner of the well, contends that Petro-Search's obligation to "maintain" the well "to meet the specifications of the Texas Railroad Commission," the regulatory agency, evidences that at all times prior to termination of the agreement, Petro-Search was required to maintain the well—in dictionary terms, to "keep the well in good working order" or to "preserve the well from lapse, decline, or failure" so as to meet "the specifications" (*i.e.,* "any requirements") of the regulatory agency. Since the agency would not permit the use of a water well without replacement of the ruptured or deteriorated tubing, Watkins ar-

gues, therefore Petro-Search did not maintain the well as required by the agreement. Watkins thus contends that the formal termination of the agreement only *after* the well had failed does not excuse it from its liability to keep the well in good working order (to "maintain" it) during the existence of the agreement. Watkins in brief states that the terms of the agreement are inconsistent with Petro-Search's position that under the contract it was "authorized to allow or permit the subject well to deteriorate from good working order to a state of total disrepair."

To the contrary, Petro-Search argues that the agreement does not set forth any agreement to replace the 33-year-old well when it failed in 1978. Petro-Search agrees that, under the terms of the agreement, it was indeed required to maintain the well (keep it in good working order), including compliance with the regulatory agency's requirements (without which the well would be closed down), so long as it was exercising its "use" of the well as contractually authorized. Petro-Search contends, however, that it had the contractual right to terminate the agreement at any time, whether or not the well met agency requirements at that time,[3] and that, in any event, upon termination of the agreement it was not required to repair usual wear and tear or natural breakdowns inevitable in an old well, in the absence of any fault in maintenance or repair on its part (and the district court found none, a finding not contested on appeal). In Petro-Search's view, under the contract it was no more liable to replace the deteriorated well if the breakdown occurred immediately *before* its formal termination of the agreement (after extensive but unsuccessful efforts to get the well in working order) than if the breakdown had occurred immediately *after* its contractually authorized termination of the agreement.

*The Agreement's Intention in the Light of the Surrounding Circumstances*

The district court made no express finding whether or not the letter agreement

---

**3.** The district court found that Petro-Search breached the agreement by not plugging the inoperative well as required by the specifica-

tions of the Texas Railroad Commission. See note 1 *supra.*

was ambiguous. At least arguendo, we will accept the plaintiff Watkins' argument that, by the court's rejection of a proposed finding of ambiguity, it indicated a holding that the agreement was unambiguous (although, nevertheless, our conclusion would not be altered by considering the parol evidence relied upon by Watkins). From the district court's factual findings, however, it is apparent that any finding of non-ambiguity was reached by considering the evidence of the surrounding circumstances, as is authorized by the Texas decisional law cited above.

In making its factual finding that Petro-Search "did not breach the terms of the letter agreement by abandoning the well at a time when it was no longer capable of receiving water," the district court relied, inter alia (including findings of termination rights), on factual findings that the well had functioned from 1945 to its breakdown in 1978, and that "[l]oss of a salt water disposal well is an event that can occur without the causative negligence of any party."

These factual findings referred to testimony that: The disposal well had been completed as a producing oil well in 1945 and converted to a salt-water disposal well in 1965. At the time of the letter agreement in 1970, the well was performing with the original casing that had been installed in 1945. The evidence indicates that over the course of time due to the corrosive effect of salt water or chemical constituents of the soil either the casing itself or the interior tubing corrodes or develops breaks to the point that the well just wears out. In this instance, the 33-year-old well had ceased taking salt water because apparently the tubing inside the well's exterior casing had become eroded or developed a break that, despite extensive efforts by Petro-Search to revive the well's usefulness, could not be repaired.[4]

■ The express language of the agreement—in the light of this circumstance (known to both parties who confected the agreement) and of others surrounding the agreement [5]—in our opinion is susceptible with regard to the issue before us of only one reasonable (and thus unambiguous) meaning: Petro-Search was given the authority to "use" the well in exchange for its obligation to "maintain" the well in working order while it was being operated for the use of both parties; this obligation included meeting the specifications (requirements) of the Texas Railroad Commission, the regulatory agency empowered to shut the well down if it did not do so.

Thus, we do not agree with the plaintiff Watkins that the obligation to "maintain" the well included an obligation to pay for the drilling of a new well when the old one had deteriorated to the point where it could no longer be repaired. On the question as to the extent of the obligation to maintain, the contract is silent rather than ambiguous. All of the parties to the agreement were well-versed in the field of oil and gas exploration. They can be presumed to have known that, as testified to by witnesses and as found by the trial court, wells are occasionally lost or will eventually wear out, despite the best efforts of the most careful operators. Once beyond repair, they can be extremely expensive to replace. See note 4 above. On the facts of this case, we do not

---

4. In some instances, it is feasible to replace the interior tubing, as had occurred on one occasion during the maintenance by one of Petro-Search's predecessors in title. Here, however, after some $6,000 had been expended in attempting to replace the tubing, it was impossible to do without expenditures in excess of $50,000. As a measure of his recovery (if his construction of the contract were to be upheld), Watkins points to testimony that the particular breakdown of this well would cost at least $66,000 to repair while drilling a replacement well would cost $87,600.

5. Surrounding circumstances include the unrestricted cancellation rights, and the agreement's limited purpose to let the plaintiff Watkins share the use of his well without having to pay money for its maintenance, while the other party upon paying for maintenance (instead of a rental or use price) would have a means to dispose of its salt water simply for maintenance costs).

deem it to be a reasonable construction of the contract to hold that, absent an express provision to the effect that the well would be replaced were it to stop functioning, the parties intended that this would be done. The unconditional power to terminate upon thirty-days notice reinforces this interpretation of a lack of intention to cover obligations extending beyond those of normal maintenance.

We therefore conclude that the only reasonable construction of the contract in this case is that the parties did not contemplate that a new well would be built if the old one were lost without fault. They only contemplated that the well would be properly cared for while it was viable. Once viability was lost, the obligation to maintain the well terminated.

We should add that, even if we were to construe the agreement to be ambiguous (so as to allow parol evidence to show not only the surrounding circumstances but also the intent of the parties), the parol evidence relied upon does not prove any intended obligation to replace the well if it permanently broke down. It shows only that the parties who confected the agreement contemplated that the obligation to "maintain" the well required that it be kept in good working order, but the testimony is silent, as is the agreement itself, as to any obligation to replace the well should it deteriorate or suffer substantial breakdown so as to become unworkable without prohibitive repair or replacement costs.

*Conclusion*

The district court thus correctly held that the defendant Petro-Search did not breach the contract by abandoning the well when it became non-operational without fault on the defendant's part and by rejecting the plaintiff Watkins' claim that under the contract Petro-Search was liable for replacement or substantial repair costs to restore the deteriorated well to usefulness. Accordingly, we AFFIRM the judgment of the trial court.

AFFIRMED.

* Former Fifth Circuit case, Section 9(1) of Public