# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 90-3908
_____


WARREN L. SEAL,

Plaintiff-Appellee,
Cross-Appellant,

VERSUS


J. RONALD KNORPP, Etc., ET AL.,

Defendants,


FLORIDA EXPLORATION COMPANY
and ENRON CORPORATION,

Defendants-Appellants,
Cross-Appellees.

*******************************************************

WARREN L. SEAL,

Plaintiff-Appellant,

VERSUS


APACHE CORPORATION OF DELAWARE, ET AL.,

Defendants,

FLORIDA EXPLORATION COMPANY
and ENRON CORPORATION,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

(March 31, 1992)

Before HIGGINBOTHAM and BARKSDALE, Circuit Judges, and McBRYDE,

District Judge.[1]

BARKSDALE, Circuit Judge:

The central issue in this consolidated appeal is whether Warren Seal was terminated for purposes of his employer's Trust Agreement, thereby allowing him to recover all of his royalty interests held in trust. This turns, in part, on his undisputed termination under the terms of his separate Employment Contract. Also in issue is whether Seal can recover for seismic data he supplied that employer. We **REVERSE** the award on the Trust Agreement claim, but **AFFIRM** the denial of the data claim.

                                I.

In 1976, for purposes of employee retention, reward, and incentive, the Florida Gas Exploration Company Employees Trust (Trust Agreement) was established.[2] As producing oil and gas properties were developed, overriding royalty interests in oil and gas leases (ORIs) were assigned to the Trust by Florida Gas (Florida Exploration)[3] for the benefit of designated employees. The Trustee paid the designated employees, on a monthly basis, their share of the income from those ORIs.[4] In addition, upon the

---

[1]    District Judge of the Northern District of Texas, sitting by designation.

[2]    The Trust was for the purpose of "keep[ing] personnel of experience and ability in the employ of [Florida Exploration] and to compensate them for their contributions to [it] ... and thereby induce them to make such contributions in the future."

[3]    Continental Group acquired Florida Gas in 1979, changing the name to Florida Exploration.

[4]    Pursuant to Trust Agreement ¶ 2(a), the payment was made "so long as [the participant] remain[ed] an employee of"

occurrence of specified events, the Trustee assigned to the employee all or part of the ORIs (depending upon the event), as well as accrued but unpaid income from them. Full (100%) assignment took place after the ORIs had been held in trust for four years, or upon the employment ending under certain conditions. But, if the employment ended for other specified reasons, the employee received less than 100% of his ORIs.

Seal became a Trust participant in 1978, when he joined Florida Exploration as vice-president of its New Orleans division. Thereafter, ORIs were assigned to the Trust for his benefit.

In 1979, Florida Exploration offered employment contracts (Employment Contract) to many of its executives to alleviate concerns about a possible acquisition. Seal signed one that May. It provided that if acquired, Florida Exploration would "continue to employ [Seal] on a full time basis for a period of not less than three years from the date of such acquisition ...." If Florida Exploration terminated Seal within that three-year period, it would pay him his salary for the balance of the period and accrue his retirement benefits under the pension plan, with them becoming fully vested at the conclusion of that period.

Employment Contract ¶ 5 covered "non-actual termination":

> *In addition to an actual termination of employment, the following shall be deemed a termination of [Seal's] employment by the Company for purposes of this agreement:*
>
> a) A substantial change in [Seal's] present level of responsibility and authority;

---

Florida Exploration.

- 3 -

> b) A reassignment to another location without his consent; or
>
> c) A substantial change from present policies or procedures affecting the areas of [Seal's] responsibilities.
>
> Acceptance of the changes listed in paragraphs (a) and (c) for a period of time shall not be deemed a waiver of [Seal's] right to claim such changes as a termination.

(Emphasis added.)[5]

No recovery could be had under the Employment Contract if the termination was for cause, which fell within three areas: "dishonesty; ... commission of a crime; or ... behavior which would generally be considered as sufficiently immoral or insubordinate to justify termination of employment."  These are identical to the first three of four bases for termination for cause under the 1976 Trust Agreement.[6]

The Employment Contract also provided for accelerated assignment to Seal of the ORIs held in trust for him under the Trust Agreement.  If he remained with Florida Exploration for a year from the date of acquisition, he would receive "all of the [ORIs] held by the Trustee for [his] benefit ... at the time of [the] acquisition ...."

The Continental Group acquired Florida Exploration on August 28, 1979, triggering the Employment Contract's three-year protected

---

[5] As discussed *infra*, the term "non-actual termination" is used to differentiate this form of contractual termination from "constructive termination".

[6] The other basis for such termination under the Trust Agreement was "inability to perform the job because of alcoholism or drugs."

period. Seal's authority was substantially reduced in mid-1982. On the day before the end of the protected period, Seal stated in a letter to Florida Exploration that, "[i]n view of the recent changes in company policy and procedure", he had reviewed his Employment Contract; that, pursuant to it, the reduction of his responsibility constituted a termination of his employment; that "[t]he only significance of this ... [was] to entitle [him] to receive [under the Trust Agreement] a `100 per cent interest in [(full assignment of)] the ... ORIs previously assigned into trust', regardless of time factors"; and that if Florida Exploration agreed with his "interpretation", the assignment could be executed.[7]

---

[7]    The letter, to Florida Exploration's President, stated:

In view of the recent changes in company policy and procedure, I reviewed my employment agreement dated May 1, 1979 to determine whether such changes may have in any way affected my rights provided for in our contract.

As I read Paragraph 5, if there is either a substantial change in my level of authority, or if there is a substantial change in company policy or procedure affecting my area of responsibility, it shall be "deemed a termination of my employment" for the purposes of the agreement.

The only significance of this provision, it seems to me, is to entitle me to receive a "100 per cent interest in the legal title to the ORI's previously assigned into trust", regardless of time factors. (Operating Policy No. 1-512, August 29, 1978 [described below]).

If you agree with my interpretation, please advise and we will work out the mechanics of assigning my overrides to which I am entitled under the above agreements.

As noted, the Employment Contract provided that if Seal was terminated during the post-acquisition three-year protected period, he would receive his salary and retirement benefits for the balance of that period, with full vesting of pension plan benefits at the end of it.  Obviously, as Seal implied in his letter, the required payments for termination during the protected period had no bearing; he did not claim termination until one day before it ended.  Hence, the statement in his letter that "[t]he only significance of [the Employment Contract's non-actual termination provision] ... is to entitle me to receive" full (100%) assignment of the ORIs held in trust for him, "regardless of time factors".

The time factor was critical, because any ORIs placed in trust for him after acquisition had not fully vested (four years required).  On the other hand, as noted, the Employment Contract provided for full assignment to Seal of his ORIs held in trust as of the August 1979 acquisition, if he remained with Florida Exploration for a year after it.  Seal had done so, and then some; his termination claim was made one day short of three years after the acquisition.  Therefore, his only ORIs for which he might not receive full assignment were those placed in trust for his benefit after the date of acquisition (August 28, 1979).  To add further to the mix, and as discussed *infra*, the Trust Agreement provided that,

---

> I intend to continue exerting my best efforts
> to make Florida Exploration successful and am
> looking forward to working with you.

The Operating Policy referenced in the letter described the Trust Agreement.

- 6 -

if Seal was terminated (except for defined cause), he was to receive full assignment of his ORIs, regardless of the normal four-year vesting period. Therefore, in order to receive the maximum assignment of his post-acquisition ORIs, Seal had to fall within the termination, except for cause, provision in the Trust Agreement.

Florida Exploration promptly denied that termination had occurred. And, Seal remained with Florida Exploration until June 1983, when he submitted his written resignation.[8] Shortly thereafter, he received the ORIs that Florida Exploration felt he was due. In 1985, Seal filed two diversity actions in Louisiana on the same day: the first asserted that he was entitled to benefits under the Employment Contract and to additional ORIs under the Trust Agreement; the second sought recovery for seismic data that he had allegedly provided Florida Exploration during that employment.

The two actions were consolidated for a bench trial. The district court held that Seal: (1) was "constructively" terminated[9]

---

[8] Seal has moved to strike the references in Florida Exploration's brief to that resignation, contending that they "are a plain violation of a pre-trial stipulation that the parties `would not seek to discover or produce facts concerning the circumstances leading up to or [his] resignation ....'" (Emphasis in original.) The references do not appear to violate the stipulation; but, in any event, and as discussed *infra*, our holding is not based on his resignation. The motion is **DENIED.**

[9] As discussed *infra*, the term "constructive termination" does not appear in either the Employment Contract or the Trust Agreement. As used by the district court, "constructive termination" refers to Seal's "non-actual termination" due to substantial changes, as provided by the Employment Contract.

under the terms of the Employment Contract and entitled to pension benefits;[10] (2) was therefore "constructively terminated without cause" under the Trust Agreement and to receive an accounting and assignment of the ORI's (and resulting income) to which he was entitled under that Agreement; but (3) had no claim for any seismic data in Florida Exploration's possession. Damages were referred to a special master. Because the ORIs had been sold by Florida Exploration, Seal was awarded their money equivalent (approximately $450,000). In addition, the judgment awarded Seal $340,000 (approximately) in prejudgment interest and $200,000 in attorney's fees; the fees were not allocated between the Employment Contract and Trust Agreement claims.

## II.

Florida Exploration contends that the district court erred in holding that Seal was terminated under the Trust Agreement. Seal counters that it erred in the amount of the award for expert witness fees in his first case and in denying him recovery on the seismic data claim in his second. Our standard of review for bench trials is well established: findings of fact are reviewed for clear error; legal issues, *de novo*. *E.g.*, Fed. R. Civ. P. 52(a);

---

[10]    Employment Contract ¶ 5 provides in part:

    Upon the conclusion of the three-year period, Employee's benefits under the pension plan shall become fully vested and Employee shall have the right, at his election, either (1) to receive the actuarial equivalent value of his benefits immediately or (2) to be treated as a regularly vested member of the pension plan.

*Missouri Pac. R.R. Co. v. Railroad Comm'n of Texas*, 948 F.2d 179, 181 (5th Cir. 1991), *petition for cert. filed*, (March 5, 1992) (No. 91-1423). Equally well established is the standard for determining whether a finding is clearly erroneous, "that is, if we are convinced[, based on our review of the record,] that the trial court made a mistake." *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 693 (5th Cir. 1992).[11]

## A.

Florida Exploration does not challenge the district court's holding that Seal was terminated (non-actual termination) under the terms of the Employment Contract. And, both parties agree that he was not terminated for cause as defined by the Trust Agreement. The issue is whether he was terminated (non-actual termination) under that Agreement.

As noted, the Trust Agreement provides for full assignment of ORIs to an employee upon, *inter alia*, termination "without cause".[12] There is less than full assignment to the employee upon, *inter alia*, voluntary termination or termination for cause.[13] Unlike the

_____

[11] "A finding of fact is clearly erroneous `only if our review of the entire record impels the definite and firm conviction that a mistake has been committed.'" *Sullivan v. Rowan Co.*, 952 F.2d 141, 147 (5th Cir. 1992) (quoting *Carr v. Alta Verde Indus.*, 931 F.2d 1055, 1058 (5th Cir. 1991)).

[12] Full assignment also occurs upon the fourth anniversary date of their assignment into the Trust, if the employee remained continuously employed; or upon retirement at age 65, total disability, or death.

[13] "`[F]or cause' shall include only...: (a) dishonesty; (b) commission of a crime; (c) behavior which generally would be accepted as sufficiently immoral or insubordinate as to justify termination of employment; [and] (d) inability to perform the job

Employment Contract, the Trust Agreement does not include a provision for non-actual termination -- events deemed equivalent to termination.

The district court found -- not challenged here -- that as a result of post-acquisition changes in mid-1982, "Mr. Seal's authority was substantially reduced by August of 1982." Accordingly, pursuant to the provision in the Employment Contract that substantial changes were "deemed a termination of [Seal's] employment ... for purposes of this agreement," it held that "[t]hese changes resulted in [his] constructive termination by Florida [Exploration] in mid-1982." Therefore, the court awarded recovery on the Employment Contract claim. It then turned to the Trust Agreement and noted that although it provided four bases for termination for cause, it did

> not contain a corresponding provision enumerating those terminations which would be considered without cause. The facts have established that Mr.

---

because of alcoholism or drugs." As noted, except for the fourth basis, these are the same bases for termination for cause as in the subsequent Employment Contract.

Voluntary termination included retirement at less than age 65. In the event of voluntary termination or termination for cause,

> the Trustee (i) shall not assign the Beneficiary any [ORI] with respect to any particular geological prospect, if his employment terminated within two (2) years of the Approval Date of that particular prospect, ... or (ii) shall assign the Beneficiary an [ORI] equal to fifty percent (50%) of the [ORI] with respect to any particular geological prospect ..., if his employment terminated within more than two (2) years but less than four (4) years of the Approval Date of that particular prospect. ...

- 10 -

> Seal's constructive termination was for none of the exclusive causes listed in the ... Trust Agreement. By logical extension, Mr. Seal was constructively terminated without cause. This conclusion is reached from the [Trust Agreement] alone; the fact that Mr. Seal was constructively terminated according to the Employment Agreement only serves to support this finding.

As noted, the term "constructive termination", as used by the district court, does not appear in either the Employment Contract or the Trust Agreement. The basis for Seal's termination for purposes of the Employment Contract -- not disputed here -- was change in "his level of responsibilities and authority". This basis does not rise to the conditions generally thought to constitute constructive termination or discharge. For example, a "constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign." *Hammond v. Katy Indep. School Dist.*, 821 S.W.2d 174, 177 (Tex. App.--Houston [14th Dist.] 1991, no writ).[14] As noted, Seal did not resign until 1983. Moreover, he stated in his earlier August 1982 termination claim letter that "he intend[ed] to continue exerting [his] best efforts to make Florida Exploration successful and [that he was] looking forward to working with [Florida Exploration's President]." Furthermore, as the district court found, shortly before Seal resigned in 1983, he brought seismic data to Florida Exploration for its use. In short, these

---

[14] As discussed *infra*, the Trust Agreement is governed by Texas law. For a discussion of the constructive discharge doctrine, *see Hammond v. Katy Independent School District*, 821 S.W.2d 174, 177 (Tex. App.--Houston [14th Dist.] 1991, no writ); *Stephens v. C.I.T. Group/Equipment Financing, Inc.*, No. 90-5646, slip op. at 3406-08 (5th Cir. March 23, 1992).

are hardly such intolerable working conditions that Seal felt compelled to resign; nor, did he claim them. As stated in his August 1982 letter, he based his termination claim solely on the Employment Contract provision concerning substantial changes. And, this was the basis for the district court's holding that he was terminated for purposes of the Employment Contract. Therefore, in order to determine whether Seal can recover under the Trust Agreement, we must focus on it. In doing so, and as noted, in order to avoid confusion with the above-discussed and non-applicable form of termination described as constructive termination, the term "non-actual termination" will be used for the form, or type, of termination claimed by Seal.

The district court was *Erie*-bound to apply the conflict of law rules of Louisiana. *Fallon v. Superior Chaircraft Corp.*, 884 F.2d 229, 231 (5th Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Those principles require that a contract provision on governing state law be given effect, unless strong public policy considerations justify otherwise. *NCH Corp. v. Broyles*, 749 F.2d 247, 250 (5th Cir. 1985) (citing *White v. Crook*, 426 So.2d 334 (La. App. 2d Cir. 1983); *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1058 (5th Cir. 1982); *ADR v. Graves*, 374 So.2d 699, 700-01 (La. App. 1st Cir. 1979)). The Trust Agreement provides that it is governed by Texas law.

As the district court held, the Employment Contract and Trust Agreement are clear and unambiguous. "In the absence of an ambiguity, the court need not look to extrinsic evidence. The

court will limit its search for the intent of parties to the intent expressed within the four corners of a document." ***Walker v. Horine***, 695 S.W.2d 572, 577 (Tex. App.--Corpus Christi 1985, no writ) (citations omitted). Therefore, we may not construe the terms of the Employment Contract and Trust Agreement together to interpret the latter. ***Hydro-Line Mfg. Co. v. Pulido***, 674 S.W.2d 382, 387 (Tex. App.--Corpus Christi 1984, error ref'd n.r.e.). And, we must construe instruments "at the time [they were] made and not in light of subsequent events." ***Hancock v. Texaco, Inc.***, 520 S.W.2d 466, 468 (Tex. Civ. App.--Corpus Christi 1975, error ref'd n.r.e.).

The Trust Agreement took effect in 1976. It was not until three years later, in response to possible acquisition, that Florida Exploration offered the Employment Contract to Seal. Needless to say, the 1976 Trust Agreement cannot be read to incorporate the subsequent non-actual termination provision in the 1979 Employment Contract. Seal's rights under the Employment Contract are not at issue; our focus is on the Trust Agreement. Under its terms, he can recover all of his ORIs only if he was terminated without cause. (Again, Florida Exploration concedes that he was not terminated for cause.)

In answering this question, we cannot, as Seal contends, assume that, for purposes of the Trust Agreement, he was terminated. Seal maintains that because the district court found that he was terminated for purposes of the Employment Contract, this conferred on him the "status ... vis-a-vis Florida

- 13 -

[Exploration,] .... of [a] terminated employee." (This is similar to the basis for his claim to his ORIs in his August 1982 termination claim letter.) But, as stated in the Employment Contract, its provision for non-actual termination was "for purposes of [that] agreement". Neither can we, as the district court seems to suggest, find by negative implication that Seal was terminated simply because he was not discharged for cause. As stated, we must look to the Trust Agreement for the answer.

When Seal tendered his termination claim in August 1982 and requested full assignment of his ORIs, he was still employed by Florida Exploration and remained with it until he resigned almost a year later. The Employment Contract's three-year protected period ended the day after his termination claim letter. Therefore, Seal's basis for non-actual termination is grounded in his employment status as of, and as expressed in, that termination claim. At that time, was he also terminated for purposes of the Trust Agreement? He was not actually terminated. He was still with Florida Exploration.

Accordingly, the only form of termination that Seal can claim (the only one he does claim) in order to recover all his ORIs under the Trust Agreement is non-actual termination. There is no provision in the Trust Agreement, however, that equates types of employment conditions or problems or changes -- even substantial ones -- with termination (non-actual termination). The Employment Agreement did, but it is obvious why such a provision was needed there. Post-acquisition, Florida Exploration would be embarking

upon different times and conditions, with new personnel possibly adding to the increased chances for substantially changed conditions. It wanted key personnel to stay on. To achieve that, it offered post-acquisition protection for three years. And, one way of doing that was to protect against substantial changes; they were defined as equivalent to termination during those three years.

The Trust Agreement, on the other hand, was enacted in 1976 for the purposes of employee retention, reward, and incentive. A provision to guard against the specter or possibility of a type or form of non-actual termination was not included. When that specter loomed in 1979, its possible effect on ORIs -- the reward under the Trust Agreement -- was ameliorated, not by amending the Trust Agreement, but by providing in the Employment Contact for accelerated assignment to Seal of his ORIs held in trust as of the date of the acquisition. Obviously, the Trust Agreement could just as easily have been amended to protect against post-acquisition non-actual termination. It wasn't. It is silent. It controls. For its purposes, Seal was not terminated. Therefore, he cannot recover all his ORIs to the extent to which he would have been entitled under the Trust Agreement if he had been terminated (without cause).

This result is reinforced by the Trust Agreement obviously intending a complete cessation of the employment -- as defined, by termination, death, disability, or retirement -- before ORIs, in their full amount or otherwise, would be assigned to the employee upon that employment ending. Such cessation was a prerequisite for

closing out and fixing what ORIs were due the employee, including ending the monthly payment of income from those ORIs.  The Trust Agreement provides for such payment only "so long as [Seal] remain[ed] an employee of" Florida Exploration.  This language is a firm indication of, or intent for, there to be an actual ending or cessation -- actual termination -- of the employment relationship.[15]

In sum, the district court erred in holding that Seal had been terminated for purposes of the Trust Agreement.  Because he was not, he is not entitled to full assignment of ORIs under the termination without cause provision of the Trust Agreement.  That part of the judgment awarding ORIs and attorney's fees, if any, on the Trust Agreement claim is vacated.

B.

---

[15]     Seal relies upon **Barnett v. Petro-Tex Chem. Corp.**, 893 F.2d 800 (5th Cir. 1990), *cert. denied*, ___ U.S. ___, 110 S. Ct. 3274 (1990).  There, we noted that in certain instances termination could occur without an end of the employment:

> In a diversity case applying Texas law, this court has defined `termination of employment' when used in a group insurance policy as `the complete severance of the relationship of employer and employee ....' **Bliss v. Equitable Life Assurance Society of the United States**, 620 F.2d 65, 69 (5th Cir. 1980) ....  It is not clear, however, that this definition applies in the context of an employment agreement.

*Id.* at 809 (citations omitted).  We concluded that "each case is controlled by the language of a policy or agreement and ... it is not universally accepted that a period of unemployment is a prerequisite for entitlement to termination pay."  *Id*. at 809. Consistent with **Barnett**, this issue is "controlled by the language of ... [the Trust] agreement."

- 16 -

Florida Exploration does not challenge the award on the Employment Contract claim.  Accordingly, Seal is still entitled to that award, including attorney's fees, if any, and costs as may be reassessed on remand.  Seal contends that he is entitled to substantial expert witness fees pursuant to **La. R.S.** 13:3666.  The district court awarded witness fees, but in the lesser amount of $30 a day, pursuant to 28 U.S.C. §§ 1920 and 1821.[16]  Seal maintains that federal diversity courts must apply **La. R.S.** 13:3666, asserting that it is a provision of Louisiana's substantive law.  He relies upon ***Henning v. Lake Charles Harbor & Terminal Dist.***, 387 F.2d 264, 267 (5th Cir. 1968), which held that, in Louisiana eminent domain proceedings, the statute is a matter of state substantive policy.  ***Henning*** has been confined, however, to such proceedings.  ***Chevalier v. Reliance Ins. Co.***, 953 F.2d 877, 886 (5th Cir. 1992) (personal injury action; "absent an express indication from the Louisiana legislature, or its courts, of Louisiana's special interest in providing litigants with recovery of expert witness fees in personal injury actions, federal law

---

[16]    Section 1920(3) permits taxing witness fees against a losing party.  Section 1821, as it existed on the date of judgment, stated that:

> (a)(1)    Except as otherwise provided by law, a witness in attendance at any court of the United States ... shall be paid the fees and allowances provided by this section. ...

> (b)  A witness shall be paid an attendance fee of $30 per day for each day's attendance.  A witness shall also be paid the attendance fee necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

controls the award of such fees as costs"); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 689 (5th Cir. 1991).  The district court did not err in limiting the amount of expert witness fees.

C.

The seismic data in issue was allegedly discovered by Seal in oil company trash bins, before he began working for Florida Exploration.[17]  It is undisputed that he voluntarily provided seismic data -- but in a disputed amount -- to Florida Exploration. Seal testified that he told Florida Exploration's chief executive officer (Sullivan) that he had seismic data in his possession and asked if Sullivan would like him (Seal) to provide it for Florida Exploration's use; and that

> one of the primary reasons why I was willing to bring the data in [was] that I wanted the division to succeed, No. 1; and I was getting paid by them, and ... getting a royalty on what I did.  So, the more [the division] found, the more money I made personally, as well as the more money the company made.

It is also undisputed that the data claim rests upon Seal's expectation; there was no written agreement about the data, including its return.  Upon Seal's departure from Florida Exploration, he requested its return.  He contends that, although Florida Exploration returned the originals, it kept copies, which later were used to discover oil and gas reserves, and were included with the sale of Florida Exploration.  He claims conversion and

---

[17]    Seal claims to have accumulated 3,000 miles of the data from trash bins.  He presented evidence that seismic data is worth $1,000 to $1,500 a mile.  In sum, Seal maintains that he pulled data worth $3 to $4 million from the trash.

asserts both that Florida Exploration was unjustly enriched, and that he is entitled to damages in quantum meruit.

The district court found, *inter alia*, that "[t]he credible evidence ... demonstrate[d] that Mr. Seal did not find the seismic data in the trash bins"; that Seal provided only one box of data to Florida Exploration, just before his resignation in 1983; and that the box was returned. Two witnesses testified that Seal did not make any data available to Florida Exploration, other than the one box. Florida Exploration returned more data than had possibly been in that box, however. It maintains that it returned the additional data in an effort to reach an amicable parting with Seal. The conflicting evidence was whether the additional data had been provided by Seal or by others.[18] Based upon our review of the record, the district court's findings are not clearly erroneous.

Seal's conversion claim for Florida Exploration's alleged use of copies it kept of the returned data also fails. As noted, the district court found that just before Seal resigned in 1983, he brought in a box of data. As for that box, it found that Seal "requested that [Mr. Miller, a Florida Exploration Geophysicist] make copies of [the data] to add to Florida [Exploration's] inventory of seismic data"; that "[f]ollowing Mr. Seal's departure from Florida [Exploration], he requested the return of the data"; that "[a]s per Mr. Seal's instructions, Mr. Miller had the data

---

[18]     As the district court noted, oil and gas companies acquire seismic data "by purchasing it, shooting it, or copying data submitted by third-parties as an inducement to a venture." The latter is referred to as "bootleg data".

copied and inventoried, and returned the originals to Mr. Seal"; and that when Seal complained, Miller returned additional data. Likewise, in its conclusions of law, the district court stated that "the evidence shows that Florida [Exploration] has returned the originals of all the seismic data Mr. Seal had provided."

Obviously, based on these findings, Seal does not have a claim for conversion or otherwise. Simply put, he consented to the transfer of the data to Florida Exploration. *See LaRue v. Crown Zellerbach Corp.*, 512 So.2d 862, 864 (La. App. 1st Cir. 1987), *writ denied*, 514 So.2d 1176 (La. 1987). We find no error in the denial of the data claim.

## III.

For the foregoing reasons, that part of the judgment awarding Seal recovery on the Trust Agreement claim (including attorney's fees, if any, awarded for that claim, as opposed to those, if any, awarded on the Employment Contract claim) is **VACATED**; the remainder of the judgment is **AFFIRMED**; and this case is **REMANDED** for such further proceedings as may be necessary, including reassessment of

attorney's fees and costs, for entry of a judgment consistent with this opinion.