**David O. EPPS, Plaintiff,**

**v.**

**NCNB TEXAS NATIONAL BANK, Defendant.**

**Civ. A. No. 3–92–CV–0509–H.**

N.D. Texas,
Dallas Division.

March 11, 1993.

---

298

James L. Hicks, Jr., Hicks & Associates, Dallas, TX, for plaintiff.

William C. Strock, Jill J. Weinberg, Haynes & Boone, Dallas, TX, for defendant.

### *MEMORANDUM OPINION AND ORDER*

SANDERS, Chief Judge.

Before the Court are Defendant's Motion for Summary Judgment, filed December 7, 1992; Plaintiff's Response, filed January 11, 1993; and Defendant's Reply, filed January 26, 1993.

### I. Background

This suit involves an alleged breach of contract and attendant ERISA issues. In June of 1989, Plaintiff David O. Epps left his career as a self-employed Certified Public Accountant to become a Senior Vice President and Division Manager for NCNB Texas National Bank ("Bank").[1] Before Epps accepted the Bank's offer of employment, Epps

and the Bank entered into a severance agreement which provided for severance pay to extend over a period of time if Epps' employment with the Bank ceased under certain conditions. Specifically, the severance agreement stated that "[i]f [Epps] should cease to be employed by [the Bank] for any reason other than termination for cause or voluntary termination, [the Bank] will pay severance on the following basis...."

In August of 1991, Plaintiff's job responsibilities changed. Plaintiff then informed the Bank that he was not pleased with his new responsibilities and stated that he believed that this change triggered the severance agreement. When the Bank declined to honor the agreement, Epps left his employment with the Bank for another position at a competing Bank. The principal question presented to the Court in this suit is whether the events which have occurred trigger the Bank's duty to honor its obligations under the severance agreement and entitle Epps to the benefit of that contract.[2]

The Bank has moved for summary judgment, contending that the severance agreement is plainly inapplicable. Plaintiff, however, asserts that summary judgment is inappropriate, arguing that the agreement is ambiguous and that a trial is required to determine a proper understanding of the intent of the parties.

### II. Analysis

■ "Summary judgment reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir.1986).

■ Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to

1. On December 21, 1991, the Bank's parent company, NCNB Corporation, merged with C & S Sovran to form NationsBank Corporation. Thus, the Bank is now known as NationsBank of Texas, N.A.

2. ERISA issues arise only if the contract claim is successful. Nevertheless the Court has previously determined that jurisdiction over this suit is proper because of the broad ERISA preemption provision, 29 U.S.C. § 1144. *See Epps v. NCNB Texas*, No. 3:92–CV–0509–H (N.D.Tex. filed May 8, 1992).

judgment or partial judgment as a matter of law. *See* Fed.R.Civ.P. 56. Before a court may grant summary judgment, the moving party must demonstrate that it is entitled to judgment as a matter of law because there is no actual dispute as to an essential element of the nonmovant's case. *See Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The threshold inquiry, therefore, is "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "the substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. at 2510.

The Supreme Court has explained that a movant for summary judgment need not support the motion with evidence negating the opponent's case; rather, once the movant establishes that there is an absence of evidence to support the non-movant's case, the burden is on the non-movant to make a showing sufficient to establish an issue of fact for each element as to which that party will have the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Once the moving party shows that it is entitled to summary judgment, the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original) (quoting Rule 56(e)); *see also Fontenot,* 780 F.2d at 1195–98. A party must do more than simply show some "metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Stated another way, "[i]f the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991) (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356). However, all of the evidence must be viewed in the light most favorable to the motion's opponent. *Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 292 (5th Cir.1990).

In its consideration of the motion for summary judgment, the Court relies on the following facts:

1) In early 1983, RepublicBank, a predecessor of the Bank, created a specialized Insurance Division designed to provide credit and non-credit financial services to select mid-sized insurance companies. *See* Swiley Affidavit at ¶ 4.

2) In 1989, Plaintiff became a candidate for the Insurance Division Manager position, a management and marketing post. At the time, Plaintiff, who had been employed for a number of years in the insurance industry, had his own CPA practice in Dallas. *See id.* at ¶ 5.

3) During the hiring process, Plaintiff expressed to John Dienes and Thomas Swiley, two officials of the Bank, his concern that the Bank might later decide to withdraw from or curtail its insurance lending business and thus effectively shut down the insurance lending functions of the Bank and eliminate the position for which Plaintiff was being considered. *See* Epps Affidavit at 3–4. Therefore, Plaintiff requested a contract which provided for severance benefits should he be discharged without cause from employment with the Bank.

4) The parties eventually negotiated a contract of employment which included a severance agreement. In a letter addressed to Plaintiff, the Bank offered to hire Plaintiff as a "Senior Vice President and Division Manager" at a salary of $95,000 per year. The offer of employment also included a severance agreement. The severance agreement stated in relevant part:

> Recognizing the risk you accept in leaving your own business, we also offer you this special severance package. *If you should cease to be employed by NCNB Texas for any reason other than termination for cause or voluntary termination, we will pay you severance* on the following basis.

*See* Swiley Affidavit at Ex. 1 (emphasis added). Plaintiff accepted the Bank's offer of employment on April 5, 1989 and began work on June 16, 1989. The parties agree that

this contract constitutes the final agreement of the parties. *See* Epps Deposition at 24–25. The parties also agree that this contract does not spell out Plaintiff's job duties.

5) Defendant notes that Plaintiff's initial job responsibilities included marketing, extending, and managing credit to primarily mid-sized companies in the insurance industry as well as cross-selling other non-credit services including trust and cash management. *See* Swiley Affidavit at ¶ 10; Epps Deposition at 25–6.

6) Defendant states that after it suffered credit problems with two of its accounts in the insurance division and because of other economic concerns, the Bank decided to become "more selective" in its insurance lending activities. Thus, in July of 1991, the Bank issued a new policy on lending to the insurance industry which made loans more difficult to obtain. Moreover, the Bank decided to liquidate much of the Insurance Division's loan portfolio. *See* Swiley Affidavit at ¶ 11–13.

7) Defendant reports that, because the level of new business was to be reduced, it decided to cut the size of its insurance lending staff. An assistant to Plaintiff was told to seek employment elsewhere, and other employees in the division were transferred to other areas of the Bank. One woman, Jennifer Olson, continued to work with Plaintiff for a period of time, but she too was eventually transferred out of the Insurance Division.

8) Plaintiff explains that in July of 1991, he was informed that the Bank was going to "discontinue" its lending activity in the insurance industry and that the Bank wanted him to dispose of the existing portfolio of insurance credits. Plaintiff says that Swiley and Dienes informed him that they wanted him to remain at the Bank and dispose of the existing portfolio, which they hoped could be completed within a year. Plaintiff reports that he received the Bank's formal credit guidelines for loans to the insurance industry shortly thereafter. Plaintiff claims that the guidelines were so restrictive that the Bank's

ability to market insurance loans effectively "ceased to exist." *See* Epps Affidavit at 5–6.

9) Plaintiff also reports that since the Bank effectively ceased making loans in the insurance industry and transferred or terminated the employees who Plaintiff supervised, he was left without any of his original job duties to perform. As a result, Plaintiff had little, if anything, to do and, on more than one occasion, asked Swiley what the bank wanted him to do. *See id.* at 6–7.

10) Plaintiff states that on August 16, 1991, he met with Bank officials who informed him that he was being assigned new job duties. Plaintiff reports that his new position, "Insurance Specialist", was a technical staff support position which did not involve either management or marketing responsibilities. *See id.* at 7.[3]

At the August 16, 1991 meeting, Plaintiff received a memo which detailed his new job responsibilities. *See id.* at Ex. E. These duties included, among other things, continuing to work down the existing Insurance Division portfolio, analyzing and providing support for the Bank's other insurance exposures, providing analytical and industry support for new credits that might be presented for approval, assisting in any work out efforts that might have been required, and becoming a specialty analyst to provide expertise in the industry. *Id.*

11) The Bank, however, reports that since it continued to have significant lending insurance exposure both within the Insurance Division and elsewhere, the Bank wished Plaintiff to serve as an "Insurance Specialist." An officer of the Bank stated that "[a]lthough Epps' title and salary would remain the same, his job duties were revised to focus on working down the existing Insurance Division portfolio. His responsibilities were also expanded to include monitoring other insurance-related exposure of [the Bank] and to provide analytical support for new insurance loans that may be presented for approval within [the Bank]. Mr. Epps also continued to service and administer selected Insurance

---

**3.** Plaintiff also states that had the Insurance Specialist job been offered to him at any time, he would not have accepted it. *See id.* at 7.

Division Loans." *See* Swiley Affidavit at ¶ 14.

Thus, according to Defendant, Plaintiff's new job responsibilities were to continue to manage the existing loan portfolio, liquidate other existing accounts in the portfolio, and assist in the analysis of other insurance credits within the Bank. *Id.* at ¶ 15, 16.

12) Plaintiff reports that on August 23, 1991, he met with Ed Brown, Swiley, and Dienes. At this meeting, Plaintiff states that he was told that he was expected to perform his new duties, that his performance would be evaluated, and that he would be terminated for cause if he did not meet the Bank's standards. *See* Epps Affidavit at 7.

13) By his own admission, Plaintiff was wary of his new job responsibilities, believing that he was not the person to carry out these duties. Plaintiff indicated that wished to be terminated, stating that "there was no reason to prolong the agony, just let's work out a deal under the contract and get me out of there." *See* Epps Deposition at 52, 82.

14) On December 6, 1991, Plaintiff received an offer of employment from Bank One.

15) On December 9, 1991, Plaintiff submitted a letter to the Bank in which he informed the Bank that he was leaving because he believed his job was eliminated and because the Bank had refused to honor the severance agreement. *See* Swiley Affidavit at ¶ 18; Ex. 3.

Defendant argues that, as a matter of law, the terms of the severance agreement defeat Plaintiff's contract claim.

 Because this aspect of the parties' dispute concerns the interpretation of the terms of their agreement, the Court briefly reviews the applicable Texas law concerning the interpretation of contracts. "In construing a written contract, the primary concern of the court is to ascertain the intentions of the parties as expressed in the instrument." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). Texas courts follow the general rule that "[o]rdinarily, all parts of contract are to be taken together, and such meaning shall be given to them as will carry out and effectuate the intention of the parties." *General Indem. Co. v. Pepper,* 161 Tex. 263, 339 S.W.2d 660, 661 (1960). The Court must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker,* 650 S.W.2d at 393; *see also Lelsz v. Kavanagh,* 824 F.2d 372, 374 (5th Cir.1987) (applying Texas law). Terms are to be given their common, plain, popular, and ordinary meaning, unless it definitely appears that the intention of the parties would thereby be defeated. *See Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527 (Tex.1987).

 Texas courts have also articulated rules of contract interpretation for construing possible ambiguities in written instruments. First, a contract is ambiguous when it is reasonably susceptible to more than one meaning, in the light of surrounding circumstances and after applying established rules of construction. *See Watkins v. Petro–Search, Inc.,* 689 F.2d 537 (5th Cir.1982); *Kelly Assoc., Ltd. v. Aetna Cas. & Sur. Co.,* 681 S.W.2d 593 (Tex.1984). Whether a contract contains an ambiguity is a question of law for a court to decide. *See Watkins,* 689 F.2d at 538. If a question regarding an ambiguity is presented:

> the court is to take the wording of the contract in light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording "by a reasonably intelligent person acquainted with all the operative usages and knowing all the circumstances prior to and contemporaneous with the making of the [integrated contract], other than the oral statements by the parties of what they intended to mean."

*Id.* (quoting *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). Once the court considers the surrounding circumstances, if the language of the contract "appears to be capable of only a single meaning, the court can then confine itself to the writing." *Id.*

 When, applying these principles, a contract is unambiguous on its face, "the instrument alone will be deemed to express the intention of the parties, for it is the objective, not subjective, intent that con-

trols." *See id.* 689 F.2d at 538. In other words, in the absence of an ambiguity, "[t]he court will limit its search for the intent of the parties to the intent expressed within the four corners of the document.' " *Seal v. Knorpp,* 957 F.2d 1230, 1235 (5th Cir.1992) (quoting *Walker v. Horine,* 695 S.W.2d 572, 577 (Tex.App.—Corpus Christi 1985, no writ)).

■ The starting point for the analysis of Defendant's motion is the language of the parties' contract. As noted above, the Bank promised to pay severance benefits to Plaintiff if he "should cease to be employed by [the Bank] for any reason other than termination for cause or voluntary termination." The present case involves at least two portions of this agreement. First, the Court must determine whether Plaintiff "cease[d] to be employed." This issue is easily disposed of. Plaintiff plainly ceased to be employed when he left the Bank to join Bank One on December 9, 1991. Thus, the Court must turn to a second issue: whether the cessation of Plaintiff's employment was the result of "voluntary termination" or whether Plaintiff ceased to be employed for some other reason.[4]

Defendant argues that it is entitled to judgment as a matter of law because, when Plaintiff left the Bank, he still had a job there with his original title and salary. Defendant notes that Plaintiff sent a letter to the Bank in which Plaintiff stated that he was leaving. Defendant claims that this fact reveals that Plaintiff voluntarily terminated his employment. Furthermore, while the Bank acknowledges that Plaintiff's job duties when he left were not the same as when he was hired, it notes that Plaintiff had defined job responsibilities as an "Insurance Specialist" and that the employment contract did not define any particular job duties for Plaintiff. Plaintiff counters by arguing that his job was effectively eliminated, thus constituting termination. In a related vein, Plaintiff claims that the meaning of the term "terminate" is ambiguous.

The Court first addresses Plaintiff's contention that he was effectively terminated from his job because the duties which he was initially hired to perform were no longer needed. Plaintiff asserts that, since his job was eliminated, he did not voluntarily terminate his employment. He thus concludes that he is entitled to severance benefits. However, the severance agreement does not set forth specific job responsibilities or provide for severance benefits if Plaintiff's job duties were to change. Thus, nothing in the contract provided for severance benefits once Plaintiff's job duties changed. While Plaintiff asserts that he never agreed to be employed in any position other than "Senior Vice President and Division Manager", Defendant correctly responds by noting that nothing prevented Plaintiff from negotiating his severance agreement to include provision which entitled him to severance pay if his job duties changed. In the absence of such a provision, Plaintiff cannot prevail.

■ It is undisputed that Plaintiff left the Bank in December of 1991. Thus, under the contract, which excludes severance benefits for voluntary termination and which the Court finds to be unambiguous, it seems that Plaintiff is not entitled to the severance benefits to which he claims to be entitled.

In an attempt to avoid this conclusion, Plaintiff points to *Barnett v. Petro–Tex Chemical Corp.,* 893 F.2d 800 (5th Cir.), *cert. denied,* 497 U.S. 1025, 110 S.Ct. 3274, 111 L.Ed.2d 784 (1990), a suit in which the Fifth Circuit considered the case of a group of Plaintiffs, former employees of the Defendant ("Petro–Tex"), who brought suit to enforce the terms of their employment contracts. Plaintiff relies on this case primarily because the summary judgment which had been granted by the district court was reversed by the Fifth Circuit. Plaintiff also implies that the holding of *Barnett* requires the Court to find that the term "terminate" is ambiguous. However, Plaintiff's reading of *Barnett* is not persuasive.

The relevant portion of the contracts involved in *Barnett* provided that the employment of the Plaintiffs would not terminate unless 90 days notice was given. However, the contracts also provided that Petro–Tex

4. There is no contention that Plaintiff was terminated for cause.

could terminate Plaintiffs' employment before the expiration of 90 days by paying the salary due to the Plaintiffs for the 90 day notice period.

The *Barnett* dispute began when Texas Petrochemicals, an unrelated entity, purchased the assets of Petro–Tex. Plaintiffs sued Petro–Tex for payment of their salaries in lieu of notice. The Defendant maintained that the Plaintiffs were not terminated within the meaning of the agreements, contending that there was no termination because the sale of the company did not interrupt the Plaintiffs' employment.

The *Barnett* court noted that the parties' contract did not define the word "terminate", reversed the summary judgment which the district court had granted to the Defendant, and remanded the case for trial. Conceding that "each case is controlled by the language of" the relevant agreement, *id.* at 809, the Fifth Circuit held that fact issues remained on two questions involving the contracts in the case: 1) the intent of the parties in providing for notice and payment of salary in lieu of notice, and 2) the meaning of "terminate" as used in the contracts. *Id.* at 809–810. Importantly, the Fifth Circuit criticized the district court's assumption that the intent of the employment contract was only to "help an individual facing an unexpected period of unemployment to ease the financial burdens while looking for a new job." *Id.* at 807. The *Barnett* court noted that the Plaintiffs alleged that they had been terminated because their salaries had been cut, their benefits had been reduced, and their job responsibilities had been changed.[5] Hence, the Fifth Circuit concluded that a fact issue remained on the question of "whether the reduced benefits offered by Texas Petrochemicals required a finding that the employees were terminated even though they were offered immediate employment." *Id.* at 810. Thus, the case was remanded to the district court.

A more analogous case is *Seal v. Knorpp*, 957 F.2d 1230 (5th Cir.1992), a case in which the Fifth Circuit held that a trust agreement was not ambiguous and that the facts presented in the case did not entitle the Plaintiff to benefits under that agreement. In *Seal*, the Defendant/company created a trust into which royalty interests in oil and gas leases were periodically placed for the benefit of each employee. The trustee paid the employees their interest in the royalties each month. Full assignment of an employee's interest in a royalty to the employee occurred after a royalty interest had been held in trust for four years, or upon the employment ending under certain circumstances: The trust agreement provided for full assignment of an employee's royalty interest which had not been held in trust for four years only if an employee was terminated without cause, retired at age 65, became totally disabled, or died.

The Plaintiff in *Seal* also had an employment contract with the company which provided that, if the company was acquired by another corporation, the company would continue to employ the Plaintiff for three years after the date of acquisition. Importantly, the employment contract had a "non-actual termination" clause which stated that substantial changes in an employee's responsibility would be considered termination for the purposes of the employment contract. No such clause existed in the trust agreement.

The Defendant/company was purchased in August of 1979, thus triggering the employment contract's three year protection period. After his authority was substantially reduced in mid–1982, Plaintiff brought suit, contending that he was entitled to benefits under the employment contract as well as the full value of the royalty interests which were held in trust for his benefit, but which had not been held in trust for four years. After a bench trial, the district court held that the Plaintiff had been "constructively terminated without cause" within the meaning of the employment and trust agreements. The Court thus held that the Plaintiff was entitled to benefits under the employment contract as well as the full assignment of the royalty interests which were still held in trust for him.

---

5. The district court reported that "[a]lthough the salary is substantially the same, the employees claim that they have lost up to forty percent of their compensation from Petro–Tex, direct and indirect." *Id.* at 807.

The Fifth Circuit reversed the trust agreement portion of the district court's decision. The court held that although the Plaintiff was entitled to benefits under the employment contract (because his authority had been reduced, thus resulting in "non-actual termination"), the Plaintiff was not entitled to benefits under the trust agreement. The *Seal* court emphasized that "the Trust Agreement does not include a provision for non-actual termination—events deemed equivalent to termination." *Id.* at 1234. The court rejected the district court's conclusion that since the Plaintiff was not terminated for any of the reasons listed in the trust agreement under "for cause termination", Plaintiff was "constructively terminated without cause" and therefore entitled to benefits under the trust agreement. The Fifth Circuit noted that the term "constructive termination" did not appear in the trust agreement; the court also held that the circumstances of the case did not rise to the level of constructive discharge as articulated in Texas law. *See id.* at 1235 (citing *Hammond v. Katy Indep. School Dist.*, 821 S.W.2d 174, 177 (Tex.App.—Houston [14th Dist.] 1991, no writ)).

The *Seal* court explained that, when the Plaintiff claimed that he had been terminated and requested full assignment of his royalty interests under the trust agreement, he was still employed with the company. Since he was still employed with the company, the only forms of termination that the Plaintiff could claim were "non-actual termination" and "constructive termination" as that phrase is defined in state law. However, the court first held that "constructive termination" had not occurred. The court noted that "[t]here is no provision in the Trust Agreement ... that equates types of employment conditions or problems or changes—even substantial ones—with termination (non-actual termination)." *Id.* at 1236. Thus, "non-actual termination" was not available to the Plaintiff.

The *Seal* Court's discussion of the trust agreement is directly applicable to the present case. The Fifth Circuit emphasized that "the Trust Agreement does not include a provision for non-actual termination—events deemed equivalent to termination." *Id.* at 1234. Like the trust agreement in *Seal*, there is no provision in the present severance agreement which indicates that a change in job responsibilities triggers Plaintiff's right to receive severance benefits. Thus, applying the undisputed facts to the unambiguous terms of the contract, the Court concludes that when he left the Bank to accept another job, Plaintiff voluntarily terminated his employment.

 However, as noted above, Plaintiff can show that he did not voluntarily terminate his employment if he can show that he was "constructively discharged." Under Texas law, "constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign." *Hammond*, 821 S.W.2d 174, 177; *Stephens v. C.I.T. Group/Equipment Financing, Inc.*, 955 F.2d 1023, 1027–29 (5th Cir.1992). The constructive discharge doctrine was developed by courts to allow Plaintiffs to satisfy the requirement of anti-discrimination laws which require them to be "terminated" before they can recover. The constructive discharge doctrine enables an employee to recover in a suit brought against his or her employer, although the employer did not technically fire the particular employee. This doctrine has been applied to suits which involve the alleged breach of an employment contract. *See Hammond*, 821 S.W.2d at 177; *Seal*, 957 F.2d at 1235.

Applying the constructive discharge doctrine to this case, Plaintiff would be able to show that he was terminated (and hence that he did not voluntarily terminate his employment) if he could show that the Bank made "conditions so intolerable that he reasonably felt compelled to resign." *Hammond*, 821 S.W.2d at 177. However, this path is not open to Plaintiff. The Court notes that constructive discharge cannot be based on an employee's subjective preferences. *See Jett v. Dallas Independent School District*, 798 F.2d 748, 755 (5th Cir.1986), *modified on other grounds*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Moreover, Texas law indicates that more than the mere reduction of responsibility, and resulting dissatisfaction, which Plaintiff has alleged is re-

quired to support a conclusion that he was constructively terminated. *See Hammond,* 821 S.W.2d at 178 (allegations of "mere 'harassment'" insufficient to raise an issue of material fact as to whether plaintiff was constructively discharged); *Jett,* 798 F.2d at 755 (loss of coaching responsibilities does not constitute constructive discharge). Applying this Texas law to the present case, the Court finds, as a matter of law, that Plaintiff was not constructively terminated. In reaching this conclusion, it is important to note that Plaintiff's salary and title remained the same throughout his tenure at the Bank. And, while Plaintiff's job duties changed, they were not reduced to such a degree that a reasonable jury could find that the cumulative effect of the Bank's actions made working conditions so intolerable that a reasonable person would have felt compelled to resign. *See Stephens,* 955 F.2d at 1027.[6]

### III. Conclusion

The Court concludes that Defendant's Motion for Summary Judgment is **GRANTED.**

**SO ORDERED**

---

**6.** The Supreme Court has held that summary judgment is proper if there is not sufficient evidence to allow a reasonable jury to return a verdict for the nonmoving party, *See Anderson,* 477 U.S. at 248–9, 106 S.Ct. at 2510.