AIR LIQUIDE AMERICA
CORP., Plaintiff,

v.

CRAIN BROS., INC., Defendant.

Civil Action No. H–96–0443.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 22, 1997.

Jay W. Brown, Beirne Maynard & Parsons, Houston, TX, for Air Liquide America Corp.

Kenneth B. Cole, Sears & Cole, Houston, TX, for Crain Bros., Inc.

Bradley B. Beers, Beers and Associates, Houston, TX, for Enterprise Products Co.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Plaintiff Air Liquide America Corporation ("Air Liquide") has filed a **Motion for Partial Summary Judgment on Claim for Contractual Indemnification** [Doc. # 17] ("Air Liquide Motion"). In addition, Plaintiff has filed a **Motion for Summary Judgment on Breach of Contract and Affirmative Defense Claim** [Doc. # 52] ("Air Liquide's Second Motion"). Defendant Crain Brothers, Inc. ("Crain") has filed a **Cross-Motion for Summary Judgment** [Doc. # 22] ("Crain Motion").

Air Liquide claims in its motions that it is entitled to indemnity for amounts it expended in resolving claims brought against it by Enterprise Products Company ("Enterprise") and Montell USA ("Montell") as a result of damage to an Enterprise pipeline. Air Liquide maintains that the pipeline damage arose from work performed by Defendant Crain, which Crain vehemently denies.

The Court has considered the motions, the responses and replies, all other matters of record in this case, and the relevant authorities. For the reasons stated herein, summary judgment in favor of Air Liquide is granted in part, and Crain's motion for summary judgment is denied.

On or before **August 29, 1997**, Air Liquide is to advise the Court of any remaining issues in this case that are appropriate for summary judgment; Crain may respond on or before **September 5, 1997**. The parties should be prepared to argue the identified issues at docket call on September 12, 1997.

### FACTUAL BACKGROUND

In September 1992, Air Liquide entered into a contract with Crain which provided that Crain would construct two Air Liquide pipelines in the Beaumont Texas, area, from the Gulf States Utility Facility to the North Star Steel Facility ("the Beaumont project"). *See* Construction Contract (Exhibit B to Air Liquide Motion). The constructed Air Liquide pipelines crossed four existing pipelines, including an Enterprise pipeline. Air Liquide alleges that, during construction of its pipelines in September or October of 1992, Crain damaged the Enterprise pipeline, resulting in a slow failure over a fifteen-month period and eventually a leak on January 19, 1994. Air Liquide further claims that the pipeline was leaking from a "severe dent," and that the damaged portion of the Enterprise pipeline was directly above an Air Liquide line.

Enterprise and its customer, Montell USA, brought claims against Air Liquide as a result of the leak, which Air Liquide settled in late 1995 for $512,328.66. *See* Settlement Agreements (Exhibits H and I to Air Liquide Motion). Air Liquide in turn sought indemnity from Crain. However, Crain maintains that it is not responsible for the leak in the Enterprise pipeline, and refused to indemnify Air Liquide. Each side has presented expert testimony supporting its position.

The parties disagree as to whether or not the 1992 Construction Contract contained an indemnity clause controlling the damage at issue in this case. The parties also disagree about the effect of a General Hold Harmless Agreement between them, which was executed in 1988.

Each side has lodged multiple objections to the other party's evidence. Since the Court's opinion herein cites almost none of the challenged material, all such objections are denied as moot unless specifically noted otherwise. If necessary, such objections may be reurged at a later stage of the litigation.

## DISCUSSION

### The Construction Contract's Indemnity Provisions

Section Three of the Construction Contract, entitled General Conditions, contains indemnity provisions.[1] Under the heading "Injuries and Damages," the Construction Contract provides as follows:

> Without regard to negligence of [sic: or] fault, *[Crain] assumes the entire responsibility and liability for, and agrees to indemnify, protect and hold [Big Three, Air Liquide's predecessor in interest], its employees and representatives harmless* from and against *all* claims, damages, expense and liabilities of *every kind or character* arising in whole or in part out of acts or failure to act of [Crain], its agents or employees, or out of the performance of the Work by [Crain], its agents and employees, or its subcontractors and their agents and employees....

Construction Contract, at 54, § 3.1504 (emphasis added).[2] This general agreement to indemnify has broad and inclusive language.

Crain argues that this indemnity provision is facially unenforceable because it fails the conspicuousness requirement. The conspicuousness requirement mandates that an indemnity provision must be presented so that "a reasonable person against whom a clause is to operate ought to have noticed it." *Dresser Industries, Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993); *see McGehee v. Certainteed Corporation,* 101 F.3d 1078, 1080 (5th Cir.1996).[3] Crain argues that since the indemnity provision quoted above "was not set out in large type or upper case, or even a heading," it would not "attract the attention of a reasonable person" and therefore the provision is unenforceable. Crain's Response to Air Liquide's Supplemental Motion for Summary Judgment [Doc. # 50] ("Crain's Response to Supplemental Motion"), at 3. *See Dresser,* 853 S.W.2d at 511; *McGehee,* 101 F.3d at 1080–81; *U.S. Rentals, Inc. v. Mundy Service Corp.,* 901 S.W.2d 789, 792 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Enserch Corp. v. Parker,* 794 S.W.2d 2, 8 (Tex.1990).

However, the requirement of fair notice does not apply when the indemnitee establishes that the indemnitor had actual notice or knowledge of the indemnity agreement. *Dresser,* 853 S.W.2d at 508 n. 2. Charles Perry, the Executive Vice President of Crain who executed the Construction Contract on Crain's behalf, testified in his deposition that he was aware that Section 3.1504 was in the contract before he signed:

Q: Okay. Let me refer you now to Section 3.1504.

A: Okay.

Q: Were you familiar with this provision before you signed the contract?

A: Without reading it—would you like me to read it and let me see what—

Q: Sure. Why don't you read it and just tell me if you're—if you were aware that provision was in the contract.

A: Yes, that's correct.

Q: All right. You were aware that provision was in the contract—

---

1. Although there is no all-encompassing signature page following Section Three, there are signatures on bid reviews and other contractual documents which follow that section. Section Three is expressly included in the Scope of Documents provision of the parties' contract. *See* Construction Contract, at 15, § 1.0301.

2. This indemnity provision encompasses, "without limitation," various kinds of damage, including:

> [a]ll other damages to property, including ways of ingress and egress and claims and demands with respect thereto except necessary and unavoidable damages to crops, timber, land and improvements within the confines of the construction Right–of–Way furnished by Owner; provided however, that [Crain] shall be liable for all damages to lands lying within or without the construction Right–of–Way which are claimed to have arisen out of [Crain's] disposition of (or failure to dispose of) any rock and other material disturbed by [Crain's] performance of the Work.

Construction Contract, at 55, § 3.1504.

3. Compliance with the fair notice requirements is a question of law for the court. *Dresser,* 853 S.W.2d at 509; *McGehee,* 101 F.3d at 1080. Crain does not dispute Air Liquide's argument that the contract satisfies the other fair notice requirement, known as the "express negligence" requirement.

A: Uh-huh.

Q: —prior to signing it—

A: That's correct.

Q: —is that correct?

A: That's correct.

Q: And this type of provision is not an unusual provision in these types of contracts; is it?

A: No.

Q: Okay. And what do you as a contractor call this type of provision?

A: Let me see here. It's basically a hold harmless provision.

Deposition of Charles Perry (Exhibit A to Air Liquide's Reply to Crain's Response to Air Liquide's Motion for Summary Judgment on Breach of Contract and Affirmative Defense Claim [Doc. # 54]) ("Perry Deposition"), at 59–60.

Given the testimony by Perry establishing that Crain had actual knowledge of the indemnification provision, the Court holds that the indemnity provision in the Construction Contract is enforceable against Crain.[4]

4. Crain also directs the Court's attention to the "Site Investigation and Representation" provision of the Construction Contract, which provides in part:

> [Crain] further represents that it has familiarized itself with all the terms and provisions of the Contract Documents and that in making its bid it does not rely upon any understanding with or representations made by an agent or employee of either Owner or Engineer in respect to the terms of the Contract Documents or the nature of the performance of the Work. To the extent that it has discussed the matter with any of the agents, employees, or representatives of either Owner or Engineer, [Crain] agrees that any such representations or understandings are not intended to and shall not operate as changes in or limitations upon the terms of the Contract Documents unless such understandings or representations are set forth in the Contract Documents.

Construction Contract, at 28–29, ¶ 2.0105. By its plain language, however, this is a provision limiting Crain's rights and privileges only, and does not impact Air Liquide's rights and privileges.

5. Although this provision is not more visible than any other provision, the heading is significant. See U.S. Rentals, 901 S.W.2d at 792. The Court cannot conceive of topics that a clause with this heading could have contained other than alloca-

Moreover, even absent actual knowledge, the Court holds that the provision in question satisfied the conspicuousness requirement under the commercial circumstances existing between the parties. Although the provision was beyond the prime signature page in the contract and its heading and text were not different from the heading and text of other provisions,[5] the provision was introduced by a heading in all capital letters stating "INJURIES AND DAMAGES." In addition, the heading was listed clearly in the table of contents for Section Three. The provision was not on the back of a page or in small, hard-to-read type. It was surrounded by related provisions outlining the parties' liability. See McGehee, 101 F.3d at 1080–81; Dresser, 853 S.W.2d at 510–511. A heading such as "INJURIES AND DAMAGES" in the parties' "General Conditions" section of a commercial contract was designed to draw attention to matters related to damages, such as indemnification.[6]

### 1988 General Hold Harmless Agreement

In addition, there is a "General Hold Harmless Agreement" executed by the par-

tion of responsibility for damage resulting from the project.

6. In addition, Section 3.2000 of the Construction Contract bears the heading "INDEMNITY AND COMPLIANCE WITH LAWS," and provides as follows:

> [Crain] shall observe and abide by all applicable laws, regulations, ordinances and other rules of the Federal and State Governments, and political subdivisions thereof, and any other duly constituted public authority wherein the Work is done; and further agrees to indemnify and hold Owner harmless from liability or penalty which may be imposed or asserted by reason of the failure or alleged failure of [Crain] or any of its subcontractors, or the agent or employees of any of them to observe and abide thereby.

Construction Contract, §§ 3.2000–3.2001. The Court does not reach the issue of whether this provision provides Air Liquide with indemnification for Crain's liability under common law doctrines such as negligence. However, the existence of this clause, with its heading including the word "INDEMNITY," gave Crain a strong indication that it was responsible for compliance with all applicable law during its work for Air Liquide. Therefore, this provision is an additional ground for holding that the indemnification provisions in the Construction Contract were sufficiently conspicuous.

ties on April 14, 1988, upon which Air Liquide relies for indemnification. *See* General Hold Harmless Agreement (Exhibit A to Air Liquide Motion). For the reasons stated below, the Court holds that this General Hold Harmless Agreement also serves as a basis for Crain's indemnity obligations to Air Liquide. Therefore, it provides an additional ground supporting summary judgment in favor of Air Liquide on the issue of indemnification.

The agreement provides in part as follows: [Crain] shall reimburse Big Three for, and indemnify Big Three and hold it harmless from and against any and all loss, costs, damage, expense, claims, suits and liability on account of any and all damage to, or loss or destruction of any properlty [sic] (including without limitation, the work covered hereunder and the property of [Crain], any subcontractors and Big Three) or injury to or death of any person (including, without limitation, employees of [Crain], any subcontractors and Big Three or any other person) arising directly or indirectly out of, or in connection with any work or contract or the making of any deliveries of materials or equipment to Big Three whether caused by a negligent act or omission OF EITHER PARTY HERETO, or their employees or otherwise. IT IS EXPRESSLY UNDERSTOOD BY CONTRACTOR THAT BY THE TERMS OF THIS PARAGRAPH CONTRACTOR IS HEREBY AGREEING TO INDEMNIFY BIG THREE AND HOLD BIG THREE HARMLESS FROM THE CONSEQUENCES OF BIG THREE'S OWN NEGLIGENCE EXCEPT THAT CONTRACTOR ASSUMES NO LIABILITY FOR THE SOLELY NEGLIGENT ACTS OF BIG THREE, ITS AGENTS, SERVANTS OR EMPLOYEES.

General Hold Harmless Agreement, at 1, ¶ 2(b). The agreement further provides that it "will cover all business relations and transactions between the parties *until revoked* by notice in writing to Big Three...." *Id.* at 2, ¶ 5 (emphasis added). Air Liquide argues that this General Hold Harmless Agreement was in effect between the parties and legally obligates Crain to indemnify Air Liquide for the damage to the Enterprise pipeline because it had not been revoked in writing, as required by its terms. Crain argues that, since the Construction Contract for the Beaumont project did not reference or incorporate the General Hold Harmless Agreement, it effectively invalidated, canceled and/or voided the General Hold Harmless Agreement for purposes of the Beaumont project. Response, at 6; Affidavit of Neil Crain (Exhibit 2 to Crain Motion) ("Crain Affidavit"). Crain's argument ignores the plain language of the earlier general agreement, which required a revocation before it became ineffective.

General principles of contract construction apply to indemnity contracts. *See Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir.1991); *Kenneth H. Hughes Interests, Inc. v. Westrup*, 879 S.W.2d 229, 232 (Tex.App.—Houston [1st Dist.] 1994, writ denied) (court seeks to reach a "common sense" reading of the indemnity agreement). A court is to "give meaning to each of a contract's provisions, in light of the circumstances surrounding the contract's execution, excluding statements of parties as to what they intended." *Fireman's Fund*, 937 F.2d at 207. When a contract is not ambiguous, "the instrument alone will be deemed to express the intention of the parties, for it is objective, not subjective, intent that controls." *Watkins v. Petro–Search, Inc.*, 689 F.2d 537 (5th Cir.1982) (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981)).[7]

Crain maintains that the Construction Contract is "a lengthy document detailing every aspect of the business relationship

---

7. A contract is ambiguous if its meaning is uncertain or doubtful, or if it is reasonably subject to more than one meaning after application of established rules of contract instruction. *See Canutillo Independent School Dist. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 700 (5th Cir.1996); *Thrift v. Estate of Hubbard*, 44 F.3d 348, 357–58 & n. 20 (5th Cir.1995); *Hanssen v. Qantas Airways Ltd.*, 904 F.2d 267, 269 (5th Cir.1990); *Watkins*, 689 F.2d at 538. In evaluating whether or not a contract is ambiguous, which is a question of law, a court evaluates the language of the instrument in light of the surrounding circumstances existing at the time of the contract. *Thrift*, 44 F.3d at 358.

formed between Air Liquide and Crain for the purpose of constructing and installing the two pipelines at the Beaumont site," and therefore that it, rather than the General Hold Harmless Agreement, governs the parties' relations. Crain Affidavit, at 1.[8] Although Crain is correct that the Construction Contract does not mention or explicitly incorporate the General Hold Harmless Agreement,[9] this does not preclude application of the general agreement. Nothing in the "Scope of Contract Documents" provision, set out in full in the margin, indicates that the documents identified represent the exclusive agreement between the parties, although such a clause could easily have been inserted. Moreover, the fact that the documents listed "for the contract for the work herein described," Construction Contract, § 1.0302, does not revoke a *General* Hold Harmless Agreement which appears to contemplate being in force throughout the parties' more specific contracts. Indeed, the General Hold Harmless Agreement states as follows:

> For and in consideration of Ten and no/100ths Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, *and in further consideration of the performance of **any work or contract** for, and in the making any deliveries of materials or equipment to BIG THREE INDUSTRIES, INC.,* its divisions or subsidiaries, hereafter referred to as "Big Three," [Crain] shall perform the same as an independent contractor in a prudent manner and shall undertake responsibility for the condition of the premises and the taking of all proper precautions pertinent to such performance.

General Hold Harmless Agreement, at 1, ¶ 1 (all emphasis added). *See id.* at 1, ¶ 2(b) (Crain agrees to hold Air Liquide harmless for damage "arising directly or indirectly out

---

8. Crain also argues that certain provisions of the Construction Contract specifically exclude application of the Hold Harmless Agreement. *See* Construction Contract § 1.0116 ("Agreement means Purchase Order or this Contract or both as used in this contract, issued by Owner and accepted by Contractor for the Contract Work, the same based on the inquiry, Contractor's proposal and all other documents listed under Section III of this contract included as attachments, exhibits, or placed in the possession of contractor as inquiry documents or by subsequent transmittal to the inquiry"); *id.* § 1.0301 (Scope of Contract Documents, quoted *infra* at 10 n. 9); *id.* § 2.0105 (Site Investigation and Representation, quoted supra at 6 n. 4). These provisions are not exclusive and nowhere state that the listed documents constitute the entire agreement between the parties.

9. The Construction Contract lists the documents constituting part of that agreement, and this list does not include the Hold Harmless agreement. The Construction Contract provides:

> *SCOPE OF CONTRACT DOCUMENTS*
> The Contract Documents on which the agreement between OWNER and Contractor is based, which contain the plans and specifications in accordance with which the work is to be done, and which provide for the method of payment of the contract price, are as follows:

| PART I | AGREEMENT | |
|---|---|---|
| PART II | GENERAL CONDITIONS AND TECHNICAL SPECIFICATIONS | |
| | (a) Section 1 | Preface |
| | (b) Section 2 | Compensation |
| | (c) Section 3 | General Conditions |
| | (d) Section 4 | Construction Specs. |
| | (e) Section 5 | Typical Construction Drawings |
| PART III | ATTACHED DRAWINGS | |

The Contract Documents together form the contract for the work herein described. The parties intend that the Contract Documents include provisions for all labor, materials, equipment, supplies, and other items necessary for the execution and completion of the Work, and all terms and conditions of payment. The Contract Documents also include all work and procedures not expressly indicated therein necessary for proper execution of this project. It is the intent of the drawings, the site investigation, the engineer's cooperative information and this Contract to provide the Contractor with a complete and discernible description, scoping and information required to execute the work; however, it is extremely difficult to describe every detail and facet of the work, therefore, the Contractor shall be expected to do all the necessary work which is not specifically spelled out in, or on the construction documents, but which can reasonably be considered within the normal scope of the contract work to achieve the described and specified end results.
Construction Contract, at 15, ¶¶ 1.0300–1.0303.

of, or in connection with any work *or contract* or the making of any deliveries of materials or equipment to Big Three") (emphasis added). The fact that the general agreement specifically states that it is in effect until revoked in writing further evidences the parties' intent that it apply over the course of various specific contracts.[10]

Crain argues that a specific contract occurring after a prior agreement can overrule the prior agreement, directing the Court's attention to *National Convenience Stores, Inc. v. Martinez,* 784 S.W.2d 468, 471 (Tex.App.—Texarkana 1989, writ denied), and Keith A. *Nelson Co. v. R.L. Jones, Inc.,* 604 S.W.2d 351 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.). These cases state that "a later contract is incorporated with or correlated to an old agreement when that is the intention of the parties expressed in the later agreement." *See National Convenience Stores,* 784 S.W.2d at 470 ("Lease Cancellation" expressly stated that the prior agreement, a lease, was to be terminated); *Nelson,* 604 S.W.2d at 353–54 (subcontract had different parties than prime contract, made no reference to prime contract, and did not incorporate prime contract's general conditions; therefore, general conditions of prime contract allowing for additional compensation were not incorporated into subcontract). Crain's cases, however, do not compel a holding in Crain's favor in this case, in which the General Hold Harmless Agreement states that it will govern, while explicitly referencing that there nevertheless may be other contracts. Texas courts have recognized that several documents should be read together when they pertain to the same transaction, even if the documents were executed at different times and even if they do not expressly refer to one another. *Richland Plantation Co. v. Justiss–Mears Oil,* 671 F.2d 154, 156 (5th Cir.1982); *Massey v. Galvan,* 822 S.W.2d 309, 315 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Milam Development Corp. v. 7*7*0*1 Wurzbach Tower Council,* 789 S.W.2d 942, 945 (Tex. App.San Antonio 1990, writ denied). More-

over, of course, an agreement should be read so as not to render any provision meaningless. *Richland,* 671 F.2d at 156.

Thus, the Court rejects Crain's various arguments and holds that the two valid agreements, whether read together or separately, clearly mandate that Crain indemnify Air Liquide for damage caused by Crain's work. As noted previously, Crain has directed the Court to no language in the Construction Contract which excludes or revokes other agreements. To the extent that Crain argues that the Construction Contract is ambiguous as to whether or not it revokes the General Hold Harmless Agreement, the Court is unpersuaded. Crain has directed the Court to no language even suggesting such revocation. The non-exclusive "Scope of Contract Documents" provision does not accomplish revocation. In addition, even if the Construction Contract were ambiguous and subject to more than one reasonable interpretation, the General Hold Harmless Agreement certainly is not, and Crain has not argued that it is. The agreement states clearly that it is effective until revoked in writing and Crain does not argue it was explicitly revoked.

Moreover, there is no conflict between the two documents since, whether they are read together or separately, the result is to indemnify Air Liquide for damage resulting from Crain's work. *See Cothron Aviation, Inc. v. Avco Corp.,* 843 S.W.2d 260, 263 (Tex. App.—Ft. Worth 1992, writ denied) ("[a] binding agreement may be collected from various writings between parties so long as such different writings do not conflict in respect to the terms, parties, and the like"). Air Liquide is indemnified both by the General Hold Harmless Agreement and by an independent provision in the Construction Contract.

This Court is required to ascertain "the meaning that would be attached to the wording 'by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to a

---

**10.** Charles Perry, Executive Vice President of Crain, executed both the Hold *Harmless* Agreement and the Construction Contract. Perry testified that he, on behalf of Crain, understood that

in order to obtain Air Liquide contracts Crain was required to execute the Hold Harmless Agreement. *See* Perry Deposition (Exhibit H to Air Liquide's Second Motion), at 90.

contemporaneous with the making of the integration, other than oral statements by the parties of what they intended.'" *Watkins*, 689 F.2d at 538 (quoting *Sun Oil*, 626 S.W.2d at 731). In this case, there is no basis to hold that a reasonably intelligent person acquainted with the circumstances prior to the Construction Contract would not consider the General Hold Harmless Agreement to be applicable. Thus, the Court concludes as a matter of law that a reasonable person would have understood the General Hold Harmless Agreement was agreement in effect unless and until revoked in writing. *Watkins*, 689 F.2d at 540–41.[11] Finally, to the extent Crain argues that it misunderstood the meaning of the agreement's language, the Court notes that Crain has not even alleged conditions that would warrant setting aside the contract on the grounds of unilateral mistake. *See Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 232 (5th Cir.1985).

> The general rule in Texas, and in other jurisdictions, is that a unilateral mistake is insufficient to warrant setting the contract aside unless the mistake is induced by acts of the other party.... An exception to the general rule precluding relief for a unilateral mistake exists when: 1) the mistake is of so great a consequence as to make enforcement of the contract unconsciona-

ble; 2) the mistake relates to a material feature of the contract; and 3) the mistake is made regardless of the exercise of ordinary care.

In light of all of the surrounding circumstances, the Court therefore holds that the Construction Contract was not ambiguous and did not revoke the General Hold Harmless Agreement. *See Hanssen*, 904 F.2d at 269.

### Cause of Damage to Enterprise Pipeline

■ The parties vigorously dispute whether or not the claims of Enterprise and Montell in fact arose in connection with Crain's work on the Air Liquide pipeline.[12] The Court holds, on the basis of the current record, that there is a genuine question of material fact on the issue of causation.

Enterprise and Montell investigated the damage to the Enterprise pipeline and concluded that Crain was responsible for the damage. *See* Demand Letter from Enterprise to Air Liquide, dated February 1, 1994 (Exhibit E to Air Liquide Motion).[13] Enterprise's letter states that its excavation of the leaking pipe revealed that the Enterprise line was "severely damaged" and leaking at both top and bottom, and that the leak was located directly over a Big Three pipeline installed in October 1992. *See id.*[14]

11. Crain also argues that this general agreement was intended by the parties to apply only when there was no written contract to apply to a specific project, and that since the Construction Contract was drawn up for the Beaumont job, the Hold Harmless Agreement was not applicable to that project. Crain Affidavit, at 1–2. However, whether or not Crain's arguments regarding its own intent are accurate, they are not reflected in the written agreement. *See Fireman's Fund*, 937 F.2d at 207 (court is to "give meaning to each of a contract's provisions, in light of the circumstances surrounding the contract's execution, *excluding statements of parties as to what they intended*") (emphasis added); *Connelly v. Paul*, 731 S.W.2d 657, 660–61 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (court looks to extraneous evidence of parties' intent only when the language of the agreement is susceptible to more than one reasonable interpretation). In addition, as Air Liquide points out, Crain representatives are inconsistent since they testified that the agreement *would* apply in the absence of a written contract, Perry Deposition (Exhibit H to Air Liquide's Second Motion), at 104, apparently indicating that the agreement

would be revoked by any written contract and then "magically revived" for future dealings without written contract. *Id.*

12. The words "arising out of" are "broad, general, and comprehensive terms." *See Canutillo Independent School Dist. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 705 n. 6 (5th Cir.1996); *McDaniels v. Great Atlantic & Pac. Tea Co.*, 602 F.2d 78, 82 (5th Cir.1979).

13. Crain objects to the demand letter as hearsay. *See* Crain Motion, at 2. To the extent the letter is introduced for the "truth of the matter asserted," *i.e.*, causation, Crain's objection is well-founded. However, the extent the letter is relied upon by Air Liquide to establish its knowledge, belief and intent as to the existence of damage to the pipeline, the letter is admissible. Fed.R.Evid. 803.

14. Air Liquide argues that the only situation in which Crain is not required to indemnify Air Liquide is if the damage arose from Air Liquide's sole negligence, and that there is no genuine issue of material fact on this point. Air Liquide

Crain argues that the leak "is scientifically and as a matter or engineering principles not Crain's fault." Crain Motion, at 3. In particular, Crain points to the conclusion of its expert that the failure of the Enterprise pipeline was the result of a single occurrence which happened at or about the time of the failure and therefore was unrelated to Crain's work fifteen months earlier. Paul J. Kovach, an expert in the field of metallurgy and failure analysis of pipelines, discusses the data and report of Law Engineering and Environmental Services:

> This electron microscopy conclusively establishes, in my opinion, that the failure of what is known as the Enterprise pipeline was the result of a single occurrence which transpired at or about the time the pipeline failed, i.e., in January, 1994. In my opinion, therefore, the pipeline failure in question could not have been related in any way to work performed by Crain Brothers, Inc., approximately 15 months earlier, i.e., in and around October, 1992. As a matter of fact, Law Engineering reached this same type of conclusion in its report where the report states that "It is certain, however, that the crack development did not happen by stages over a two year period. This was a single event."
> .... I know Les Harrington who is one of the engineers who prepared the Law Engineering report ..., and he has explained to me that the above mentioned language in the Law Engineering report means that Law Engineering's opinion was that *a single occurrence happening at or about the time of the pipeline failure precipitated that failure.*

Affidavit of Paul J. Kovach (Exhibit 1 to Response). ("Kovach Affidavit"), at 2, ¶¶ 3–4 (emphasis added) (quoting Law Engineering Report (Exhibit B to Kovach Affidavit), at

5).[15] Kovach also states that he visually inspected the fractured surfaces and that his inspection confirmed the results of the electronmicroscopy. *Id.* at 3, ¶ 5.

Air Liquide has presented evidence from the investigation of the leak showing that the Enterprise line was severely damaged from top to bottom, that the line was leaking from a severe crimp or dented area, and that the crimped area was directly above the spot where the Air Liquide line crossed the Enterprise line. *See* Affidavit of Charles R. Morin, P.E. (Exhibit A to Air Liquide's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment and Response to Defendant's Motion for Summary Judgment [Doc. # 29] ("Plaintiff's Reply")) ("Morin Affidavit");[16] Photographs of Damaged Line (Exhibit D to Air Liquide Motion).[17] Air Liquide also has presented evidence from the owner of the property that no other rights-of-way or easements were granted from the time Air Liquide secured its easement until February 1994. *See* Air Liquide's Supplemental Motion, at 5; Affidavit of Robert Dunham (Exhibit J to Air Liquide Motion) (there is no record of any right-of-way or easement granted across the Beaumont property from the time of the Big Three easement until February 1994, and if such an easement had been granted it would be reflected in the records).

Charles R. Morin, P.E., an engineer and metallurgist, has provided an affidavit which concludes as follows:

> [T]his pipeline failure exhibits the characteristics of a failure caused by contractor damage during the construction of the Air Liquide lines. This conclusion is supported by, among other factors: the location of the damage; the type of damage to the pipe; the history of the pipeline; the

---

Motion, at 9. Nevertheless, there appears on the current record to remain a fact question as to whether Crain's actions or failure to act was the cause of the damage at issue.

**15.** The factual and methodological bases for Kovach's and Law Engineering's conclusions are not apparent from the affidavit. Nevertheless, the Court is not prepared to hold, prior to a *Daubert* hearing, that these reports do not demonstrate a genuine question of material fact.

**16.** Crain's objections to the Morin Affidavit are overruled at this time.

**17.** The Court has perused the photos. It is unclear how such a dent could have occurred if not by impact. However, the timing of the impact appears, subject to *Daubert* rulings, to be a genuine question of material fact.

operation of the pipeline; and the evidence of strain-age embrittlement.

Morin Affidavit, at 2. He further explains that "strain-age embrittlement" is a "well-known phenomenon in the metallurgical field." *Id.*

> Strain-age embrittlement is a process by which a piece of metal that is damaged becomes increasingly brittle over time ... leaving it increasingly susceptible to failure. It is the initial damage to the metal, however, which precipitates the later failure.
>
> The evidence of strain age embrittlement is important in at least three respects. First, strain-age embrittlement follows severe damage to the metal, such as would be caused by contractor damage, such as a bump by machinery or a crease caused by outside force. Second, strain-age embrittlement explains the delay between the time of the damage and the time of the leak. Third, strain-age embrittlement results in the brittle, cleavage-type fracture surfaces noted by everyone who has examined this pipe specimen.

*Id.* In response to the Kovach Affidavit, Morin states that Kovach's statement that the failure could not have been the result of Crain's work fifteen months earlier is "inconsistent with a sound, well-founded methodology based on good grounds." *Id.* Morin's report concludes that the damage to the Enterprise pipeline was due to a "large blunt force directed at the side of the pipe by a powerful, strong and hard object, such as the side of an excavator bucket," and that the initial damage was inflicted by Crain. Report of Engineering Systems Inc. (Exhibit B to Morin Affidavit) ("Morin Report"), at 6.

> The only reasonable conclusion that can be drawn from the location and nature of the dent and crease is that the damage was done by [Crain] during the laying of the dual 6–inch lines where they passed immediately under the specific leak area.... Even though the physical damage to the line was immediate, because of the nature of the cracking observed and progressive brittleness that should be expected by natural strain aging, the probability of leakage would continue to increase with time

after the damage is inflicted. Because natural strain aging requires some appreciable time to develop, brittle failure a year (or more) after the initial damage is introduced is not at all surprising.... The writer has personal experience with delayed brittle failures of this sort in pipeline and other applications as well.

*Id.* at 4–5.

Both Air Liquide and Crain argue that summary judgment is appropriate in their favor on this issue because the other side has presented insufficient evidence to create a genuine question of material fact. Both sides also challenge the other's expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The Court holds, on the record presented, that the differing opinions of the parties' experts creates a fact question. However, the Court has not reached the *Daubert* issues the parties intend to present. Therefore, summary judgment on the issue of causation is denied at this time. The parties are instructed to file all *Daubert* motions by **September 3, 1997,** and to file all responses on or before **September 15, 1997.** In addition, the parties are to confer and inform the Court whether they seek a hearing on the *Daubert* issues and, if so, (1) the amount of time necessary for the hearing, and (2) whether live testimony will be presented.

### Right of Contribution

■ Crain argues that Air Liquide may not seek contribution, directing the Court to Texas case law holding that "when a co-defendant settles with a plaintiff, the settlement extinguishes the settling defendant's right of contribution from an alleged nonsettling joint tortfeasor." *See Insurance Co. of N. Am. v. Security Ins. Co.*, 790 S.W.2d 407, 410 (Tex.App.—Houston [1st Dist.] 1990, no writ); Crain's Reply to Air Liquide's Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment ... [Doc. # 37], at 1–2. However, Air Liquide states that it is not relying upon common law indemnification. The Construction Contract itself provides that Air Liquide may settle claims brought against it and then in turn

seek reimbursement from Crain, *see* Construction Contract, § 1.1505, and Crain has presented no argument or authority suggesting that the common law doctrine on which it relies invalidates this provision of the contract.[18]

### *Statute of Limitations and Tort Issues*

The arguments raised by the parties concerning statute of limitations for various alleged torts, the applicability of strict liability in trespass, and other tort issues appear moot in light of the above holdings.[19] However, if the parties disagree, they may so advise the Court at the upcoming docket call setting.

### *CONCLUSION*

For the foregoing reasons, it is hereby

**ORDERED** that Air Liquide's **Motion for Partial Summary Judgment on Claim for Contractual Indemnification** [Doc. # 17] is **GRANTED IN PART.** Summary judgment is granted in favor of Air Liquide on the issue of contractual indemnification, and denied on the issue of causation. It is further

**ORDERED** that Crain's **Cross–Motion for Summary Judgment** [Doc. # 22] is **DENIED.** It is further

**ORDERED** that on or before **August 29, 1997,** Air Liquide is to advise the Court of any remaining issues in this case that are appropriate for summary judgment. Crain may respond on or before **September 5, 1997.** The parties should be prepared to argue the identified issues at docket call on September 12, 1997. It is further

**ORDERED** that the parties are instructed to file all *Daubert* motions by **September 3, 1997,** and to file all responses on or before **September 15, 1997.** The parties are to confer and inform the Court whether they seek a hearing on the *Daubert* issues and, if so, (1) the amount of time necessary for the hearing, and (2) whether live testimony will be presented.

---

18. Moreover, even if Air Liquide were required to rely upon common law indemnity, there is case law holding that common law indemnity remains available when the claimant's liability is purely vicarious, which would appear to apply to the facts at bar. *See* Air Liquide's Supplemental Motion [Doc. # 49], at 16–17 (citing *Central Consolidated Inc. v. Robertshaw Controls Co.,* 868 S.W.2d 910, 912 (Tex.App.—Beaumont 1994, writ denied)); *Medical Protective Co. v. Groce, et al.,* 814 S.W.2d 124, 130 (Tex.App.—Corpus Christi 1991, writ denied).

19. The Court notes that Air Liquide requests no punitive damages in its First Amended Complaint. Plaintiff's requested damages are actual damages, consequential damages, indemnity under the construction contract, attorneys' fees, costs, expenses, and all other relief to which it may be justly entitled.