**F I L E D**
**United States Court of Appeals
Tenth Circuit**

**OCT 17 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

NATIONAL ENTERPRISES, INC.,

Plaintiff-Appellant,

v.

FIRST WESTERN FINANCIAL
CORPORATION, a New Mexico
corporation; HOWARD T. VAN
PELT; and JAMES E. HAWORTH,

Defendants-Appellees.

No. 96-2168
(D.C. No. CIV 94-1012 JC/LFG)
(D. N.M.)

---

ORDER AND JUDGMENT[*]

---

Before BRORBY, LOGAN, and HENRY, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff National Enterprises, Inc., the assignee and holder of a $100,000 promissory note, commenced this action to collect from the maker, defendant First Western Financial Corporation, and the guarantors, defendants Howard T. Van Pelt and James E. Haworth. On cross motions for summary judgment, the district court entered judgment in favor of defendants, based on its determination that a settlement agreement reached in an earlier action unambiguously encompassed the promissory note. We exercise appellate jurisdiction over the district court's judgment and final order pursuant to 28 U.S.C. § 1291 and we reverse.

**BACKGROUND**

On December 1, 1985, Las Lomas Joint Venture (Las Lomas), an entity 50% owned by First Western Financial Corporation (First Western) and 50% owned by VMH Partners, a general partnership formed by Van Pelt, Haworth, and another individual, borrowed $8.9 million from Sandia Federal Savings & Loan Association (Sandia) for development of an apartment and day-care facility in El Paso, Texas (the project). The loan was evidenced by an $8.9 million promissory note, guaranteed by the individual partners in VMH Partners, and secured by a deed of trust on the joint venture's property.

The first deed of trust provided that it would also secure "all other direct and indirect indebtedness now or at any time in the future owing or to be owing

-2-

by [Las Lomas to Sandia], regardless of how evidenced or incurred, it being understood that it is contemplated that [Las Lomas] will become further indebted to [Sandia] in the future." Appellee's Suppl. App. at 195. According to defendants, the parties anticipated the need for an additional $500,000 loan, due to Sandia's failure to honor its previous commitment to participate in the project as an equity partner. Sandia's internal documents show requests from First Western for loans "in conjunction with financing" the project. Appellant's App. at 51-52.

The project did experience a budget shortfall. On July 16, 1986, Sandia loaned $100,000 to First Western, which was "used in connection with the operations" of the project. Appellant's App. at 46. The promissory note evidencing this loan is the subject of this action.

Both Sandia and the project experienced financial difficulties. In 1989, Sandia failed and was placed into receivership by the Resolution Trust Corporation (RTC). Las Lomas defaulted on the $8.9 million loan; First Western defaulted on the $100,000 loan. In July 1990, Las Lomas filed a lender liability action against the RTC as receiver for Sandia, alleging that Sandia had caused the project's deficiencies by, among other things, reneging on its agreement to participate in the project and breaking its commitment to loan the additional $500,000. The Complaint did not mention the $100,000 loan to First Western.

The RTC, Las Lomas, and the guarantors settled the lender liability action in July 1992. The Compromise and Settlement Agreement (the agreement) resolved "the remaining balance owed under the Loan and . . . all matters, claims, causes of action, rights, liabilities and obligations between and among them relating to or arising out of the Loan, the Loan Documents, and the Suit." Id. at 16. According to the agreement definitions, (1) "the Loan" was the $8.9 million loan, id. at 14; (2) the "Loan Documents" consisted of the $8.9 million note, deed of trust, guaranty agreements, assignment of leases and rents, financing statements, and "any and all other documents, instruments and agreements executed in connection with or to secure the Note," id. at 14-15; (3) the "Suit" was the lender liability action, id. at 15; and (4) the "Borrower" was Las Lomas, id. at 14.

To settle the suit, Las Lomas relinquished possession and control of the project and paid $500,000 to the RTC. In return, the RTC agreed, "for itself and its successors and assigns, [to] RELEASE, ACQUIT and FOREVER DISCHARGE Borrower and Guarantors . . . from any and all claims, demands, obligations, and causes of action of any nature whatsoever relating to or in any way arising out of the Note and the Loan Documents." Id. at 17-18. The RTC, however, did not "waive any rights it may have against any person not a party hereto." Id. at 20. Las Lomas and the guarantors released the RTC from all

claims, "whether known or unknown, present or future, relating to or in any way arising out of the Note, the Loan Documents, the Property and the Suit . . . ." Id. at 17. Miscellaneous terms included an integration clause, a statement that the parties entered into the agreement to "avoid litigation and buy peace," and a provision requiring the agreement to be interpreted under Texas law. Id. at 19-20. On behalf of Las Lomas, the agreement was signed by Van Pelt, as president of general partner First Western, and Haworth, as partner of general partner VMH Partners. Haworth and Van Pelt also signed as guarantors. See id. at 21.

In September 1994, the RTC filed this collection action on the $100,000 note and then assigned the note to National Enterprises.[1] On cross motions for summary judgment, the district court determined that the settlement agreement was unambiguous and that it "resolve[d] all loans and issues concerning the Las Lomas project." Id. at 158. The court therefore granted defendants' motion for summary judgment.[2] National Enterprises now appeals.

---

[1] National Enterprises was substituted as a party and the RTC was dismissed on September 14, 1995. Generally, "jurisdiction is to be determined by facts existing at the time of filing suit." Penteco Corp. Ltd. Partnership v. Union Gas Sys., Inc., 929 F.2d 1519, 1522 n.2 (10th Cir. 1991). We note, however, that the Third Circuit recently refused to apply the "time of filing" rule to jurisdiction under § 1441a. See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1503-04 (3d Cir. 1996). Although the logic underlying the New Rock determination may have merit, this court has not considered or adopted this exception to the time of filing rule.

[2] In the district court, defendants also claimed that they were entitled to

(continued...)

**DISCUSSION**

"We review the grant of summary judgment de novo, applying the same standard as the district court. Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law. We consider the record in the light most favorable to the non-moving party." United States v. Sackett, 114 F.3d 1050, 1051 (10th Cir. 1997) (quotations and citations omitted). "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." James Barlow Family Ltd. Partnership v. David M. Munson, Inc., No. 96-1202, 1997 WL 525196, *2 (10th Cir. Aug. 26, 1997).

As with any other contract, the presence of ambiguity in a term of a settlement agreement is to be determined as a matter of law. See Carland v. Metropolitan Life Ins. Co., 935 F.2d 1114, 1120 (10th Cir. 1991). "Under Texas law, a contract is ambiguous if, after applying established rules of interpretation,

---

[2](...continued)
summary judgment because National Enterprises does not have the original note in its possession and the note lacks proper endorsement. The district court did not evaluate these contentions, defendants do not pursue them on appeal, and we do not address them in this order and judgment.

the written instrument remains reasonably susceptible to more than one meaning."

Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc., 117 F.3d 180, 191

(5th Cir. 1997) (quotations and citations omitted).

Ambiguity may be patent, that is, evident on the face of the contract, or it

may be latent.

> A latent ambiguity arises when a contract which is unambiguous on
> its face is applied to the subject matter with which it deals and an
> ambiguity appears by reason of some collateral matter. If a latent
> ambiguity arises from this application, parol evidence is admissible
> for the purpose of ascertaining the true intention of the parties as
> expressed in the agreement.

National Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520

(Tex. 1995) (citations omitted). Once a writing is found to be ambiguous,

determination of the parties' intent through extrinsic evidence presents a question

of fact. See Watkins v. Petro-Search, Inc., 689 F.2d 537, 538 (5th Cir. 1982)

(applying Texas law).

In this instance, the release language of the agreement is apparently clear.

A latent ambiguity emerges, however, when the focus is on whether the agreement

releases First Western and the guarantors from liability on the $100,000 note.

The circumstances surrounding the execution of the agreement suggest two

reasonable meanings.

The district court accepted defendants' position that the "agreement . . .

resolve[d] all loans and issues concerning the entire Las Lomas project."

Appellants' App. at 158. This expansive view of "documents . . . executed in connection with" the $8.9 million note and "matters . . . relating to or arising out of the Loan," Appellants' App. at 15-16, is plausible, in that (1) the parties contemplated additional loans for the project at the time they closed the $8.9 million loan; (2) the parties agreed that the deed of trust securing the $8.9 million note would also secure later borrowings; (3) the proceeds from the $100,000 loan went toward the project; and (4) the parties expressed their intention to buy peace and avoid litigation.

On the other hand, an intention to exclude the $100,000 note from the scope of the agreement is suggested by the specific listing of only the $8.9 million loan, the accompanying documents, and the lender liability suit. Support for this narrower interpretation can be found in several aspects of the parties' dealings: for instance, (1) First Western, not Las Lomas, was the maker of the $100,000 note; (2) First Western signed the agreement solely in the capacity of general partner of Las Lomas; (3) Las Lomas made no mention of the $100,000 note in its lender liability complaint; (4) Sandia evidently failed to link the two loans in its

records;[3] and (5) the RTC was released from known or unknown claims relating to the Las Lomas property, as well as the note, loan documents, and lawsuit.

Because the agreement is reasonably susceptible to more than one meaning, it is ambiguous.  Moreover, the determination of the agreement's scope is a question of fact which cannot be resolved on this record.  The parties' contradictory versions of the circumstances surrounding the execution of the agreement create a genuine issue of material fact as to whether the parties intended to discharge defendants from liability under the $100,000 note. Summary judgment is therefore inappropriate.

---

[3]    In its brief, National Enterprises argues that the D'Oench, Duhme doctrine bars defendants' efforts to link the $100,000 and $8.9 million loans.  See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942) (holding that borrowers or guarantors are estopped from using unrecorded side agreements to defend against efforts by the FDIC or its assignees to collect on promissory notes acquired from a failed banking institution); 12 U.S.C. § 1823(e) (codifying the doctrine).  The D'Oench doctrine plays no part in our determination that the settlement agreement contains a latent ambiguity, and we do not address the doctrine in this order and judgment.  We note, however, that an analysis of the doctrine may become necessary on remand if the defendants continue to argue that the note was to be "repaid, if at all, only from the project's positive cash flow or from the ultimate sale of the apartments from proceeds in excess of the first mortgage balance." Appellant's App. at 47.

We REVERSE the district court's grant of summary judgment in favor of defendants, and REMAND for further proceedings.

Entered for the Court

Robert H. Henry
Circuit Judge