**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 10 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIONAL ENTERPRISES, INC.,

        Plaintiff - Appellant,

    v.

FIRST WESTERN FINANCIAL
CORPORATION, a New Mexico
corporation; HOWARD T. VAN PELT;
and JAMES E. HAWORTH,

        Defendants - Appellees.

No. 98-2176

(D. New Mexico)

(D.C. No. CIV-94-1012)

---

**ORDER AND JUDGMENT**  *

---

Before **ANDERSON** , **McKAY** , and **LUCERO** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1.9. The case is
therefore ordered submitted without oral argument.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3

By this action, National Enterprises, Inc. ("National") seeks payment of a $100,000 promissory note (the "Note"), from the Note maker, defendant First Western Financial Corporation ("First Western"), and the Note guarantors, defendants Howard T. Van Pelt and James E. Haworth.[1] Following a bench trial, the district court entered judgment in favor of defendants (collectively "First Western"). National appeals, contending that the district court erred by 1) improperly applying Texas contract law, and 2) considering defenses based on unrecorded side agreements. We affirm.

## BACKGROUND

Briefly stated, resolution of whether First Western is liable on the Note depends upon the interpretation of a prior compromise and settlement agreement (the "Agreement") between the Resolution Trust Corporation ("RTC") and the defendants. First Western contends that the Agreement released the defendants from any such liability, while National contends that the Note was not included in the Agreement's release. In a previous appeal following the district court's summary judgment in favor of the defendants, we concluded that the Agreement contained a latent ambiguity, and, finding a genuine dispute as to the parties' intentions, we reversed the grant of summary judgment and remanded for further

---

[1] The action was originally commenced by the Resolution Trust Corporation ("RTC"). After bringing the action, the RTC assigned the note and guarantees to National which was then substituted as Plaintiff.

proceedings. National Enterprises, Inc. v. First Western Financial, No. 96-2168, 1997 WL 642081 (10th Cir. Oct. 17, 1997) ("National I").

On remand, the district court held a bench trial. The following facts are relevant to our review.[2] Sometime prior to March 1985, First Western and a general partnership formed by Van Pelt, Haworth, and another individual (VMH Partners), entered into the Las Lomas Joint Venture ("Las Lomas"), to develop an apartment and day-care facility in El Paso, Texas (the "Project"). To finance the Project, First Western, acting for Las Lomas, negotiated an $8.9 million loan (the "Loan") from Sandia Federal Savings & Loan Association (Sandia). Findings of Fact ("Finding") 3, Appellant's Br. Attach. at 2. The Loan was evidenced by an $8.9 million promissory note dated December 1, 1995, and was guaranteed by Van Pelt and Haworth, and secured by a deed of trust on the Project.[3] The trust deed provided that it would also secure "all other direct and indirect indebtedness now or at any time in the future owing or to be owing by Grantor to Beneficiaries,

---

[2]Some of these facts were disputed prior to trial. However, in this appeal, National makes no claim that any of the district court's findings are clearly erroneous, and, therefore, we consider such facts as properly established and proven.

[3]The grantor of the trust deed is designated as "Las Lomas Joint Venture, a Texas joint venture comprised of First Western Financial Corporation, a New Mexico corporation and VMH Partners, a New Mexico general partnership." Appellee's Supp. App. at 10. The trust deed is signed by First Western and VMH Partners as the two joint venturers acting on behalf of Las Lomas Joint Venture. Id. at 39-40.

regardless of how evidenced or incurred, it being understood that it is contemplated that Grantor will become further indebted to Beneficiaries in the future." Appellee's Supp. App. at 12.

Sandia originally committed to participate in the project as an equity partner, but, before the loan was closed, it advised Las Lomas that it could not honor that commitment. Therefore, the parties anticipated the need for, and approvals of, additional loans to cover cash shortfalls. Finding 7. In fact, the project experienced a budget shortfall, and First Western requested additional loans "in conjunction with financing" the Project. National I, 1997 WL 642081, at *1 (quoting from documents submitted); see also Finding 8. On July 16, 1986, Sandia loaned $100,000 to First Western, and Sandia took the Note and guarantees which are the subject of this action.

In 1988, Las Lomas defaulted on the $8.9 million loan, and First Western defaulted on the Note. In 1989, Sandia failed. In July 1990, Las Lomas filed a lender liability action against the RTC which was then the receiver for Sandia. The complaint alleged that Sandia's actions and omissions had caused the Project's deficiencies and the resulting default, and it also alleged separate claims against the RTC. However, it did not specifically mention the $100,000 Note.

In July 1992, the RTC, Las Lomas (as represented by First Western and the VMH general partnership), and the individual guarantors entered into a settlement

agreement (the "Agreement") "to compromise doubtful and disputed claims, avoid litigation and buy peace." Appellant's App. at 51. As consideration for the settlement, Las Lomas consented to the foreclosure of the Project and paid more than $300,000 to the RTC. Appellant's App. at 48-50; Appellee's Supp. App. at 44. Las Lomas and the guarantors also released the RTC from all claims, "whether known or unknown, present or future, relating to or in any way arising out of the Note, the Loan Documents, the Property and the Suit . . . ." Appellant's App. at 49. In return, the RTC agreed, "for itself and its successors and assigns, [to] RELEASE, ACQUIT and FOREVER DISCHARGE Borrower and Guarantors . . . from any and all claims, demands, obligations, and causes of action of any nature whatsoever relating to or in any way arising out of the Note and the Loan Documents." Id. at 49-50. The RTC, however, did not "waive any rights it may have against any person not a party hereto." Id. at 52. Miscellaneous terms included an integration clause and a provision requiring the agreement to be interpreted under Texas law. Id. at 51-52. Van Pelt, as president of general partner First Western, and Haworth, as partner of general partner VMH Partners, signed the Agreement on behalf of Las Lomas. Haworth and Van Pelt also signed as guarantors. See id. at 53.

According to National, the Note was not related to the Project. Moreover, it contends that the defendants may not argue any relationship, since such a

defense would depend upon a secret agreement which deliberately obfuscated the relationship in order to hide the fact that the Project was more expensive than anticipated. National thus contends that the Agreement did not discharge the Note. By contrast, First Western contends that the parties always understood and agreed that the $100,000 Note was related to the Project and its financing, the underlying documents manifested that understanding and agreement, and, when they executed the Agreement, the parties intended to and did discharge the Note.

In National I we observed that "[t]he circumstances surrounding the execution of the agreement suggest two reasonable meanings," and, therefore, we concluded that the district court needed to resolve disputed questions of material fact before it could determine whether the Agreement discharged First Western from liability on the $100,000 Note. National I, 1997 WL 642081, at *3. On remand, the district court found the defendants' version of the circumstances more credible than National's, and it concluded that the Agreement served to release the obligation of the $100,000 Note along with the obligation of the $8.9 million loan.

In reaching that conclusion, the district court made the following specific findings: (1) The RTC, by and through its agents, knew that the $100,000 Note was related to the Project and the Project indebtedness (Findings 14, 15); (2) specific actions of the RTC support the conclusion that it understood that the

Note was to be included in the settlement (Findings 18(a), (b)); and

(3) correspondence from First Western and responses from the RTC support the conclusion that, as finally drafted, the Agreement compromised all the RTC's Project-related claims against the defendants (Findings 18(c), (d)). From the bench, the district court also opined that, even if a different understanding may have been held by the RTC agents responsible for finally drafting the Agreement (who apparently did not have the complete RTC file), that narrower understanding was "not the defendant's fault." Appellant's Reply Br. at 4 (quoting Transcript at 172).

National now appeals, contending that the district court misapplied the law to the facts.

**DISCUSSION**

"'If a contract's construction depends upon extrinsic facts and circumstances, then its terms become questions of fact.'" Northwest Cent. Pipeline Corp. v. JER Partnership, 943 F.2d 1219, 1228 (10th Cir. 1991) (quoting Amoco Production Co. v. Western Slope Gas Co., 754 F.2d 303, 309 (10th Cir. 1985)); accord Watkins v. Petro-Search, Inc., 689 F.2d 537, 538 (5th Cir. 1982) (applying Texas law). While we review the district court's findings of fact for clear error, we review de novo its application of the law to those facts. See LDL

<u>Research & Dev. II, Ltd. v. Commissioner</u>, 124 F.3d 1338, 1342 (10th Cir. 1997); <u>see also</u> Fed. R. Civ. P. 52(a).

Although it does not argue that the court's findings are clearly erroneous, National contends that the district court's judgment must be reversed for two reasons. First, National argues that the facts do not support an accord under Texas law. Second, it argues that any finding of a relationship between the Note and the Project violates the <u>D'Oench</u> doctrine.[4]

## A.    Accord

National argues that we should reverse because the court improperly construed Texas law to conclude that the facts, as found, establish an accord and satisfaction. In support, National points out that Texas law on accord requires that the terms of the accord be clearly communicated, and that the parties "unmistakabl[y]" agree that "acceptance [of less than the full amount due] will constitute satisfaction of the underlying obligation." Appellant's Br. at 8 (quoting <u>Flowers v. Diamond Shamrock Corp.</u>, 693 F.2d 1146, 1151 (5th Cir. 1982)).

---

[4]As we noted in <u>National I</u>, <u>D'Oench, Duhme & Co., Inc. v. FDIC</u>, 315 U.S. 447 (1942), held that borrowers and guarantors are estopped from using unrecorded side agreements to defend against efforts by the FDIC or its assignees to collect on promissory notes acquired from a failed banking institution. <u>National I</u>, 1997 WL 642081, at *3 n.3; <u>see also</u> 12 U.S.C. § 1823(e) (codifying the doctrine).

National contends that, notwithstanding the broad language by which the RTC agreed to "RELEASE, ACQUIT and FOREVER DISCHARGE Borrower and Guarantors . . . from any and all claims, demands, obligations, and causes of action of any nature whatsoever relating to or in any way arising out of the Note and the Loan Documents," the fact that the final drafter was unaware of the $100,000 Note precludes its inclusion, absent express mention.[5]  National attempts to buttress its position with the undisputed fact that, in the final negotiating stages,  the RTC expressly refused to give a blanket release.  Thus, National contends that the RTC clearly rejected any accord which covered anything other than the $8.9 million loan.

While it is true that the RTC refused to give a blanket release, it did agree to release any claims resulting from the "transaction," Finding 18(c), and, moreover, the release it ultimately gave covered any claim "relating to or in any

---

[5]Essentially, National argues that, notwithstanding any knowledge which other RTC agents might have had while preliminary negotiations were occurring, the RTC and its successor may rely upon the lack of knowledge of the final Agreement drafters.  However, National cites no Texas law for such a proposition, and our review of the cases that National cites on other points suggests a contrary result. "'[I]f the creditor is to be held to have surrendered his claim against the debtor, it must be shown that he understood or should have understood that he was doing so when he received the consideration claimed therefor.'" Flowers, 693 F.2d at 1152 (quoting Call of Houston, Inc. v. Mulvey, 343 S.W.2d 522, 524 (Tex. Civ. App. 1961) (emphasis added)).

way arising out of" the $8.9 million Note and associated Loan Documents,[6] Appellant's App. at 50. Thus, for purposes of satisfying the communication required under Texas law, the RTC clearly agreed to release any claims related to the transaction or Project. Accordingly, the district court's findings that the $100,000 was related to the Project compel the conclusion that the Note was released.

## B. **D'Oench Doctrine**

As its second claim of error, National contends that D'Oench, Duhme & Co., Inc. v. FDIC, 315 U.S. 447 (1942), prevents First Western from raising any defense based on a secret relationship between the Note and the Project. In this case, the district court found that the RTC knew about the relationship between the Note and the Project when it entered into the Agreement. That finding is not

---

[6]The "Loan Documents" consisted of the $8.9 million note, deed of trust, guaranty agreements, assignment of leases and rents, financing statements, and "any and all other documents, instruments and agreements executed in connection with or to secure the Note." Appellant's App. at 46-47.

clearly erroneous.[7]  Accordingly, the Agreement extinguished the Note, along with any claims which may have been based on D'Oench.[8]

AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge

_____

[7]Although we observed, in passing, in the prior appeal that a D'Oench analysis might apply to a specific argument which the defendants had raised during the summary judgment stage, following remand, the defendants abandoned that argument.  National I, 1997 WL 642081, at *3 n.3 (noting "that an analysis of the doctrine may become necessary on remand if the defendants continue to argue that the note was to be 'repaid, if at all, only from the project's positive cash flow or from the ultimate sale of the apartments from proceeds in excess of the first mortgage balance'").  As the district court's finding that the Note was related to the Project does not depend on any such secret limiting agreement, our prior caveat does not apply.

[8]Under the circumstances, even assuming, arguendo, that the RTC might have been able to claim the benefit of the D'Oench doctrine in its earlier negotiations, it waived any such claim when it negotiated a settlement which included the Note.  Moreover, it is not clear that the D'Oench doctrine would have applied in any event, since even before the RTC became involved, Sandia documents, such as the Note renewal documentation, stated the relationship. See, e.g., Appellee's Supp. App. at 5.

- 11 -